**J. B. TAYLOR et al., Plaintiffs,**

**v.**

**E. P. PERINI, Superintendent, Defendant.**

**Civ. No. C 69–275.**

United States District Court, N. D. Ohio, W. D.

March 18, 1977.

See also, D.C., 413 F.Supp. 189; D.C., 421 F.Supp. 740.

Niki Z. Schwartz, Cleveland, Ohio, for plaintiffs.

William J. Brown, Atty. Gen., Columbus, Ohio, for defendant.

## MEMORANDUM AND ORDER

DON J. YOUNG, District Judge:

The defendants have filed objections to the Third Report of the Special Master, which was filed February 10, 1977.

The objections deal with two matters in the report, the grievance machinery and the pre-hire psychological testing.

From the Court's standpoint, these two matters have always been the most important elements in effecting compliance with the order of September 12, 1972. They also have significance far beyond the narrow confines of this particular case, and must be considered in their broader aspects, if for no other reason than the administrative problems of the state department of which the Marion Correctional Institution is a part. However, they will be considered separately in this memorandum.

### I. *The Objection with Respect to the Grievance Machinery*

The first two paragraphs of the order of September 12, 1972 prohibit the defendants from engaging in acts or practices that are discriminatory in purpose or effect, and from engaging in any form of racial harassment, intimidation or insult against members of the plaintiff class.

In ruling upon the first report of the Special Master, the Court found non-compliance with the order in that there was no effective grievance procedure maintained to process complaints relating to racial discrimination, harassment, intimidation, or insult.

The need of the development of an effective and independent grievance system was again referred to in the Second Report of the Special Master. The Court found that it would not find the order of September 12, 1972 had been complied with until a more effective and independent inmate grievance system had been developed and implemented.

The reports of the Special Master detail the work that was done toward the development and implementation of a more effective and independent grievance system. At the time of the Third Report an inmate grievance system had been developed and implemented to a considerable extent. Its functioning is being observed, not only by the Special Master, but by a special committee of persons most of whom are not in the employ of the defendants or the Department of Rehabilitation and Correction.

The defendants object specifically to the statement in the Third Report that

It is the conviction of the Special Master that some form of permanent external monitoring is an essential ingredient to an effective grievance system.

The objections, however, deal with the defendants' construction of the word "independent" which they state they had originally construed to mean independent of the institution, and not independent of the Department.

Their contentions are that until the grievance system which has been effectuated has been observed and evaluated, it is premature to conclude that external monitoring is essential to an effective grievance system; that such a system of external monitoring would add another level to the system, but might not be needed, efficient, or independent; and finally, although they refrain from developing the argument, that an order requiring external monitoring "might be beyond the scope of an appropriate plan to remedy past acts of alleged wrongdoing."

As to the matter of prematurity, the report clearly shows that the new system is

being observed and evaluated. Certainly this is proper. Experience under the new system should give some insight into how effective it may become when it is operating fully as it is designed to operate. Experience is always a useful source of knowledge in dealing with human problems. Nevertheless, experience is neither a substitute for nor better than, intelligence and reason in dealing with such problems. As Benjamin Franklin said "Experience keeps a dear school, but fools will learn in no other, and scarce in that." This Court has already had close to a decade of experience with the problems at MCI, and shares the misgivings of the Special Master. The Court hopes that the new grievance system will prove to be so effective as to eliminate any question of the need for external monitoring. The Court's experience clouds that hope considerably.

As to the matter of necessity, efficiency, or independence, the Court would point out that the burden in this case is not upon the plaintiffs now, since they prevailed, but on the defendants. While the Court has no enthusiasm for the normal political process of creating additional layers of staff when jobs do not get done, it is up to the defendants to prove that they can comply with this Court's order without the necessity of having some one with no axe to grind calling their deficiencies to their attention.

In simplest terms, the problem may ultimately reduce itself either to the independent monitoring group, or the necessity of the Court retaining jurisdiction indefinitely. In another case, the Court pointed out that history seemed to indicate that it took forty years to eliminate all vestiges of bad old practices. In more immediate times, in the *Hartford Empire* case, this Court monitored its order for more than thirty years. It can do so again if it has to.

Finally, the suggestion that future wrongs are beyond the scope of a remedy for past wrongs does not withstand analysis. In the first place, the past wrongs which gave rise to this litigation neither have been nor can be remedied. An insult once uttered cannot be recalled, nor can a person who has been insulted or harassed ever be made fully whole. Under our common law, the only remedy the law provides for such wrongs is an award of damages, which was not made and cannot now be made in this matter.

The Civil Rights laws contemplate that in addition to that common law remedy, there is also the equitable remedy of injunction. This remedy is entirely prospective. It operates only to prevent future wrongs. The law, however, is not so naive as to suppose that merely saying "Thou shalt not . . ." is sufficient to eliminate future evil. The only real remedy that this Court can give in this case is to see to it that the defendants demonstrate their compliance with the order of September 12, 1972 by adopting administrative procedures that will insure. a permanent change of old bad habits.

It has already been conclusively established in this case that the defendants did not, for a long time, comply with this Court's order. Whether or not this Court maintains continuing jurisdiction in this case, the order of September 12, 1972, binds the defendants in perpetuity, and anyone who conceives himself to have been injured by a violation of the order may bring action to require the defendants to show cause why they should not be punished as for contempt for the violation. In such a context it cannot possibly be said that future wrongs are beyond the scope of this case.

The defendants' objections to that portion of the Third Report of the Special Master dealing with the grievance machinery will be overruled.

## II. *The Objection with Respect to the Pre-hire Psychological Testing*

Paragraph 10(d) of the order of September 12, 1972 is expressed in very clear and simple language. It requires the administration to all candidates for staff positions of psychological examinations designed to disclose any propensity for racism, sadism, or brutality and to assist in selecting candidates most likely to have a helping, client-service orientation.

As the case developed after September 12, 1972, it became apparent both from the evidence adduced at various hearings in open court, and the reports of the Special

Master, that this rather simple paragraph was causing very complex problems.

Roughly, these problems seem to fall into two categories. The first was that which resulted from the defendants' belief, expressed both overtly and covertly, that this provision was a manifestation of the Court's theorizing, which they had no intention of paying any attention to whatsoever, except to the extent necessary to deceive the Court by pretending to comply with it.

The second category of problems arises from the fact that psychologists did not appear to agree that there were any readily available tests, or perhaps any tests at all, designed to accomplish the purpose of the subparagraph. This apparent disagreement was most unfortunate, for the Court is stubborn in its belief that compliance with this subparagraph is one of the most important, if not the most important, of all the elements involved in the Court's order.

The necessity of holding a hearing so that the Court could resolve the conflicting views of the psychologists was resolved by the apparent agreement of the parties to have experts construct and validate a test battery which could be used to bring the defendants into compliance with the order. Part of this has been accomplished, although it was necessary for the Court to amend and elaborate the language of subparagraph 10(d) in order to do so. This elaboration did not in any way change the basic form or meaning of the subparagraph. According to the reports of the Special Master, a tentative test battery has been constructed, and is about to be employed.

The defendants' objections are in the form of a refusal to make the necessary follow-up tests to determine the validity of the final test battery which will be designed for them to use in order to comply with the Court's order.

The defendants also question the portion of the report of the Special Master that the cost of scoring and clinical evaluation of the tentative test battery to be administered in compliance with the order is outside of the contract with the experts developing the test battery, and will have to be paid for by the defendants.

As to this matter, the order of September 12, 1972 is clear and dispositive. The order requires the defendants to administer the test. Obviously, administering the test involves more than having the candidate fill out the papers and then discarding the papers. The tests have to be scored and evaluated by someone competent and professionally honest enough to do so properly. The Court supposed that this matter had been resolved in connection with the hearings which led to the appointment of the Special Master. The defendants' objections in this regard will be overruled. It is their obligation to administer and to pay for the scoring and evaluation of all future pre-hire psychological examinations.

To return to the matter of the "longitudinal empirical validation study" which the Special Master reports should be made, and which he hopes that the Department will cooperate with, the Special Master says that he does not regard such a step as being essential to compliance with subparagraph 10(d) of the order. The Court would perhaps have agreed at the time the order was entered. However, the conduct of the defendants with respect to compliance, and the difficulties that have been encountered in respect to the construction of an acceptable test battery, have a strong tendency to make the Court feel that from a strictly legal standpoint, it is incumbent upon the defendants to establish empirically, as well as theoretically, the validity of the final battery constructed.

In a sense, it is somewhat incongruous for the defendants, who have continuously taken the position that the empiric method is the only proper way of proving anything, to be satisfied now with merely theoretical proof. It reminds one somewhat of Don Quixote's construction of his helmet. It also raises questions as to whether there may not be some rather obvious ulterior motives, such as that of saving money, for defendants' eagerness in this instance to rely on the scientific method instead of empiricism.

The Court is not prepared to make a final resolution of this problem at this time. It was possible to avoid doing so in the matter

of constructing the test battery by getting a grant of funds. Perhaps if a sufficiently unified and enthusiastic attempt is made to do so once more, the necessity for a showdown with perhaps a resultant appeal, can again be avoided.

The defendants' objections in this regard will be overruled at this time, with leave, however, to refile them if the problem remains unsolved at the time of subsequent reports of the Special Master.

■ WHEREFORE, for the reasons stated, good cause therefor appearing, it is

ORDERED that the objections of the defendants to the Third Report of the Special Master be, and the same hereby are, overruled; and it is

FURTHER ORDERED that the Third Report of the Special Master be, and the same hereby is, adopted in all respects; attached hereto as Appendix A, incorporated herein by reference, and made a part hereof as fully for all intents and purposes as if set forth at length herein; and it is

FURTHER ORDERED that the defendants have leave to renew their objection to the conducting of a longitudinal empirical validation study of the psychological test battery at an appropriate future time, should they desire to do so.

IT IS SO ORDERED.

## APPENDIX

### THIRD REPORT OF THE SPECIAL MASTER ON THE DEFENDANT'S STATE OF COMPLIANCE

Submitted by Vincent M. Nathan,[*] Special Master.

### INTRODUCTION

The report which follows describes the defendant's state of compliance with the Court's Order in this case as of January 21, 1977. As the third report of the Special Master, it supplements earlier reports which may be found in *Taylor v. Perini*, 413 F.Supp. 189, 198 (N.D.Ohio 1976) and *Taylor v. Perini*, 421 F.Supp. 740, 742 (N.D.Ohio 1976). The original order to which this report relates may be found in *Taylor v. Perini*, 413 F.Supp. 189, 194 (N.D.Ohio 1976). No effort is made to restate the detailed provisions of that Order or the conclusions and findings of the Special Master contained in earlier reports.

The work of the Special Master in this case has consumed almost thirteen months. Superintendent Perini and his staff as well as Director George Denton and his staff have continued to cooperate in every way and have made themselves available to deal with the difficult problems underlying this case. As a result, substantial progress has been made in effectuating many provisions of the Court's Order. While several serious problems remain, steps have been taken to develop compliance plans with respect to all of the provisions of the Order.

### PROHIBITORY PARAGRAPHS

Since the Court's adoption of the second report of the Special Master on September 23, 1976, the principal emphasis of the Special Master has been upon the implementation of a compliance plan with respect to these paragraphs. The compliance plan described in that second report consisted of (1) development of an effective and independent grievance system to deal with allegations of racial discrimination, harassment, intimidation or insult and (2) establishment of a permanent inmate council at Marion Correctional Institution. Substantial progress has been made in both areas.

The special committee established on June 4, 1976, to study Ohio's inmate grievance system submitted its unanimous report to Director Denton on October 8, 1976. That report consisted of a letter of transmittal together with four proposed Administrative Regulations. See Appendix A, page 598 *infra*. Proposed Administrative Regulation 845 provides for the appointment of an Inspector of Institutional Services at each correctional institution under the jurisdiction of the Department. While reporting directly to the institution's superintendent, the Inspector of Institutional Services is accountable as well to the newly

* Professor of Law, the University of Toledo.

established departmental grievance officer established by proposed Administrative Regulation 845A. This individual serves two functions. The first is that of an appellate officer to hear inmates' appeals from decisions rendered by the Inspector of Institutional Services and/or the Superintendent; the second is that of a monitoring agency to insure that local grievance systems are operating efficiently and in keeping with the Department's policies.

Proposed Administrative Regulation 845B establishes a new and somewhat more efficient grievance procedure to be followed by inmates. The system is designed to provide the fastest possible response to grievances as well as to develop written records for review by the departmental grievance officer and others. Finally, proposed Administrative Regulation 845C calls for the establishment of an external review commission to examine and review the operation of the new grievance system. The membership of the proposed commission would consist of five persons nominated by the deans of the state supported law schools in Ohio, three persons selected by the Director of the Department of Rehabilitation and Correction, and one person (to serve as chairman) nominated by the Chief Justice of the Supreme Court of Ohio.

Following the submission of its written report, the special committee met with Director Denton and members of his staff on October 19, 1976. A number of aspects of the committee's proposals were discussed at that meeting. On November 5, 1976, the Director responded to the Chairman of the special committee, accepting with only minor modification the Committee's proposed Administrative Regulations 845, 845A and 845B. The Director rejected proposed Administrative Regulation 845C and suggested in its place interim monitoring by the special committee for a period of several months.

In a subsequent meeting between the Director and the Special Master on November 10, 1976, agreement was reached with respect to all details concerning proposed Administrative Regulations 845, 845A and 845B. A compromise was reached with respect to the issue of outside monitoring. The plan which emerged was the creation of a temporary external monitoring committee charged to report both to the Director and to the Special Master after six months of study of the new system. Both parties agreed to the appointment of John Conrad (the chairman of the earlier special committee) to serve as Chairman of the external monitoring committee. It was further agreed that the Special Master would be authorized to nominate two of the six members of the monitoring committee, subject to the Director's power of veto. Mr. Denton agreed to provide full support for the activities of the committee and to insure cooperation from all employees of the Department of Rehabilitation and Correction. On December 21, 1976, the Department issued new Administrative Regulations containing the provisions agreed upon by the Special Master and the Director. These Administrative Regulations numbered 5120–9–29, 5120–9–30, and 5120–9–31 are attached as Appendix B, page 607 *infra.*

On January 7, 1977, the Director and the Special Master met again to agree upon the membership of the monitoring committee. The committee which emerged from that discussion consisted of the following persons:

Chairman:

Mr. John Conrad
Columbus, Ohio

Members:

Mr. William L. Howland
Portsmouth, Ohio

Mrs. Robert F. Jackson
Toledo, Ohio

Dr. Walter D. McClaskey
Marion, Ohio

Mr. Harrison Morris
Columbus, Ohio

Mr. Norman Zemmelman
Toledo, Ohio

Mr. Conrad is a Senior Fellow in the Center on Crime and Justice at the Academy for Contemporary Problems. Mr. Howland is an attorney and a past President of the

Ohio State Bar Association. He serves as a member of the Citizens Advisory Committee for Southern Ohio Correctional Facility. Mrs. Jackson is an active volunteer worker and a past Chairman of the League of Women Voters in Toledo. Dr. McClaskey is a member of the House of Representatives of the Ohio Legislature and serves as a member of the Citizens Advisory Committee for Marion Correctional Institution. Mr. Morris is the Educational Administrator of Ohio's Department of Rehabilitation and Correction. Mr. Norman Zemmelman is an attorney with substantial experience in the field of criminal law.

The Director and the Special Master agreed upon the substance of a charge to the external monitoring committee. See Appendix C, page 613 *infra*. On January 11, 1977, Director Denton appointed the committee and distributed copies of the joint charge to all members. That committee will begin to function in early February, 1977. Its report will be due on or about August 1, 1977.

Pursuant to Administrative Régulation 5120–9–30, Mr. David R. McKeen was appointed to serve as Chief Inspector of the Department of Rehabilitation and Correction. Mr. McKeen's first task was the appointment of persons to serve as Inspectors of Institutional Services at the various institutions throughout the state. In a number of institutions, persons who were serving as Inmate Liaison Officers under the former system were retained; in several, however, including Marion Correctional Institution, new appointments were made. Mr. McKeen has met with all the Inspectors and has prepared forms and issued directives for the implementation of the new grievance system.

The two inmate councils—one for the stockade and one for the honor dormitory—elected at M.C.I. on August 6, 1976, have functioned with reasonable success since that time. Superintendent Perini assigned his Associate Superintendent for Treatment Services to provide liaison between the stockade council and the Superintendent; the same function in connection with the honor dormitory council was assigned to the Administrative Assistant to the Superintendent at M.C.I. Both of the councils have experienced difficulty in convincing other inmates that sufficient progress is being made. It is fair to say, however, that such difficulty was foreseeable at the time the councils were formed. There is substantial evidence that Superintendent Perini has made a good faith effort to cooperate with both groups, and the staff members who have been assigned to serve as liaison have been effective in their efforts to work with the inmate groups at the first level of staff involvement.

Both councils have adopted rules of governance which have been approved by Superintendent Perini. See Appendix D, page 615 *infra*. In the case of the stockade council in particular, a good deal of time was necessary for internal organization and investigation of general inmate complaints. Both groups, however, have accomplished certain of their objectives.

For example, on December 17, 1976, Superintendent Perini responded formally and positively to an earlier request by the stockade council for the development of a new system to remedy shortages in sheets and pillow cases issued to inmates. The new policy is reported to be effective in dealing with the problem. The stockade council itself has issued one report to the general population, summarizing its activities from August, 1976 to January, 1977. That report is attached as Appendix E, page 624 *infra*.

The honor dormitory council has addressed itself to a number of problems in that unit. On December 17, 1976, Superintendent Perini made a formal response to a number of problems raised earlier by the council. That response is attached as Appendix F, page 626 *infra*. In addition, Superintendent Perini's Administrative Assistant has been successful in resolving a number of complaints (e.g. malfunctioning of plumbing) without recourse to the Superintendent.

Meetings between the two councils and the Superintendent have not been frequent

or regular. This has resulted to a large extent, however, from the difficulties experienced by both groups in organizing themselves as well as from the laudable insistence of the inmate groups that they be prepared factually on an issue before presenting it to the Superintendent. With the end of the expected shakedown period, it is to be hoped that regular meetings with the Superintendent will occur.

Under the rules adopted by both inmate councils, members serve for a period of six months. A second election was held on February 5, 1977. The number of inmates who voted in the election was high, indicating that the councils have commanded the interest of the population of the institution.

The Special Master has been very favorably impressed by the quality of both the leadership and the general membership of both of the inmate councils. The transition between the original groups and the newly elected councils will be of the utmost importance to the future operation and effectiveness of these inmate bodies.

One additional matter remains to be discussed in connection with the prohibitory paragraphs of the Court's Order. In his first report, the Special Master made a finding of discrimination with respect to the denial of a request by inmates of Hispanic origin to form an institutional organization. *Taylor v. Perini*, 413 F.Supp. 189, 267 (N.D.Ohio 1976). Since that time, efforts have been made to address the needs of Hispanic inmates in two ways. Special provision was made for Hispanic inmates to elect one member of the stockade inmate council. In addition, Mr. Kenneth Cookson, the Assistant to the Special Master, has met several times with these inmates to develop a Spanish Culture program. Mr. Cookson has been aided in this effort by Father Frederick Furey, the Catholic Chaplain at M.C.I. As a result of these meetings a proposal and set of guidelines for such a program is in the process of preparation and will be presented to the Superintendent in the near future.

## CONCLUSIONS

In the opinion of the Special Master, very substantial progress has been made to deal with the difficult problems of racial discrimination harassment, intimidation, and insult which are proscribed by the prohibitory paragraphs of the Court's Order of September 12, 1972. The newly adopted departmental grievance system is designed to deal with complaints of this nature as well as other grievances which inmates may have. It is the conviction of the Special Master that some form of permanent external monitoring is an essential ingredient in an effective grievance system. This was the position of the special committee which studied the former system and recommended extensive change including the adoption of permanent external monitoring. The precise form of the external monitoring mechanism is not a matter of great importance so long as the review is conducted primarily by persons outside the correctional structure and independent of the Department of Rehabilitation and Correction. A chief effect of external monitoring will be to promote the system's credibility in the eyes of inmates and thus to encourage them to utilize the grievance procedure. In addition, reliable external monitoring will be of substantial assistance to the Director in conducting the continuous assessment of the system which is necessary in order to maintain an effective grievance mechanism. Thus far, the Department of Rehabilitation and Correction has agreed only to interim monitoring for six months, and it is the strong recommendation of the Special Master that this matter be reconsidered by the Department during the initial monitoring period.

As predicted by the Special Master in his second report, the newly established inmate councils at M.C.I. have not accomplished miracles. With the continuation of a good faith effort by the prison's administration to cooperate with the councils and to strengthen them, these organizations may take root in the institution. Above and beyond all other compliance efforts, Superintendent Perini and his staff must recog-

nize that this will be the chief contribution of the institution itself to the termination of this litigation and the prevention of future suits like *Taylor v. Perini.* With respect to the Department of Rehabilitation and Correction, the implementation of an effective and independent grievance system is the chief contribution which it can make toward these goals.

## PARAGRAPH 1

Seven incidents of error in the handling of legal mail addressed to inmates at M.C.I. have occurred since the end of the period covered by the second report of the Special Master.

| Date | Sender | Nature of Error |
|------|--------|-----------------|
| 9/23/76 | Family Court Stark County | Opened incorrectly at Chillicothe Correctional Institution. Handled as legal mail after arrival at M.C.I. |
| 10/14/76 | Public Defender Office Toledo, Ohio | Opened incorrectly at Central Medical and Reception Center in Columbus. Handled as legal mail after arrival at M.C.I. |
| 11/20/76 | University of Dayton School of Law | Improperly opened by relief officer in mailroom at M.C.I. |
| 12/27/76 | Akron University School of Law | Improperly opened by relief officer in mailroom at M.C.I. |
| 12/27/76 | American Civil Liberties Union Cleveland, Ohio | Improperly opened by relief officer in mailroom at M.C.I. |
| 12/27/76 | Kentucky Civil Liberties Union Louisville, Kentucky | Improperly opened by relief officer in mailroom at M.C.I. |
| 12/27/76 | American Civil Liberties Union Cleveland, Ohio | Improperly opened by relief officer in mailroom at M.C.I. |

Of these, only five can be attributed to improper treatment by staff at Marion Correctional Institution. Four occurred on the same day and resulted from the error of one relief officer. The period covered by this report includes the unusually heavy mail received by the institution around Christmas. Superintendent Perini obtained the names of senders of legal mail opened improperly by M.C.I. staff and sent letters of apology to all of those persons.

Inmates continue to complain about general mailroom operations, alleging that sorting and delivery are not being handled in a conscientious and efficient manner. These complaints are under consideration at this time by the stockade inmate council, and it is to be hoped that the council and the administration will be able to work together to devise improved procedures.

## CONCLUSIONS

The institution remains in compliance with the provisions of Paragraph 1 of the Court's Order. The incidence of error, while unfortunate, remains within reasonable bounds. That regular mailroom personnel have become familiar with the newly adopted procedures is confirmed by the fact that all errors chargeable to M.C.I. staff were committed by two relief officers. This phenomenon, however, makes it clear that greater care must be exercised in training and supervising relief personnel in the mailrooms in the institution.

## PARAGRAPH 2

The stockade law library at M.C.I. continues to be staffed by two inmate law clerks and one inmate typist. According to the inmate law clerks involved, this number is sufficient to handle the workload in the law library. The Special Master has attempted to determine on an independent basis whether or not this is the case. In order to do so, he asked the inmate law clerks to complete "Legal Assistance Request Forms" for all inmates requesting legal assistance from a clerk. Between November 22, 1976 and January 8, 1977, 40 such requests were made. No inmate has complained to the Special Master that the law library is staffed inadequately.

The inmate law clerks continue to complain about the absence of duplicating facilities which would avoid the necessity to type as many as 12 copies of some lengthy legal documents. Three photocopy machines are located in the institution, and inmates are apparently willing to pay for copies. Although no machine is located in an area to which the law clerks have access, arrangements could be made to have photocopying done on a daily or every other day basis. This would have the effect of freeing the inmate law clerks for other and more important tasks.

The inmate law clerks have complained as well about difficulties encountered in contacting the inmates for whom they are doing legal work. This requires a greater degree of freedom of movement throughout the institution or the ability to call inmates on pass during their non-working hours.

On September 15, 1976, Professor Rhoda L. Berkowitz, who has been serving as consultant to the Special Master with respect to the development of adequate law library facilities at M.C.I., submitted a list of books which she recommended be purchased for the stockade law library. See Appendix G, pages 629–630 infra. On October 5, 1976, Mr. Stephen Yost of the Department of Rehabilitation and Correction, informed the Special Master that "that library is essentially in compliance with Professor Berkowitz's list except for the purchase of a few additional copies of the 'nutshell' volumes." In the near future, Professor Berkowitz will conduct her own inventory of legal materials in the stockade library and report to the Special Master.

Since the Court's adoption of the second report of the Special Master, a new law library has been opened in the honor dormitory at M.C.I. Two inmate law clerks have been assigned to this area which serves also as a general library for inmates in the honor dormitory. This level of staffing appears to be entirely adequate for the population of that unit. Thirteen legal assistance request forms were received by inmate law clerks in the honor dormitory between December 17, 1976 and January 11, 1977.

Unfortunately, an adequate supply of law books has not yet been placed in the honor dormitory law library, and shelving for the books which will be placed there has not yet been completed. Steps have been taken, however, to accomplish these objectives.

On September 15, 1976, Professor Berkowitz submitted a list of books which she recommended be purchased for the honor dormitory library. See Appendix H, page 630 infra. On October 5, 1976, Mr. Yost informed the Special Master that the institution "has been directed to undertake to bring the honor dormitory law library up to the basic level as set forth in Professor Berkowitz's list and to report their progress in this direction by November 15, 1976." Following this directive, efforts were made to obtain a number of used law books from publishers, but this effort was unsuccessful. Other correctional institutions in Ohio were contacted, and a number of duplicate copies in those institutions were sent to Marion.

Subsequently, Mr. Yost and the Special Master agreed that efforts would be made in the first instance to obtain for the honor dormitory law library all books on a list of recommended books compiled by Mr. Yost on December 15, 1975. See Appendix I, pages 631–632 infra. This list is somewhat shorter than that proposed by Professor Berkowitz, and Mr. Yost agreed that further consideration would be given to addi-

tional purchases recommended by Professor Berkowitz after the honor dormitory law library reached recommended departmental standards. An inventory of the law book holdings in the honor dormitory was completed by one of the inmate law clerks on December 7, 1976, and an order for a number of titles was prepared by Mr. Yost and approved by the Assistant Director of the Department on January 4, 1977. To date, some but not all of these volumes have been received in Marion.

The Special Master has not made an independent inventory of current law library holdings in the honor dormitory. Casual inspection, however, makes it clear that a substantial number of the required volumes are not available at this time to inmates in the honor dormitory. While efforts are being made to develop the honor dormitory law library, those inmates do not have access to the law library in the stockade. It is reported, however, that law books are sent to the honor dormitory from the stockade on a loan basis when certain volumes are requested by inmates and/or law clerks in the honor dormitory.

The honor dormitory law library is under the jurisdiction of the institution's librarian, Mr. David Williams. Inmate law clerks report that the new facility has been stocked with adequate quantities of legal supplies. Several work tables are available to inmates as is one typewriter. The law library is open Monday–Friday, 12:30–8:30 p. m.; Saturday, 8:30 a. m.–3:30 p. m.; and Sunday, 1:00–9:00 p. m.

## CONCLUSIONS

A careful and complete inventory of all legal materials held in both law libraries at M.C.I. is necessary in order to be certain that all required legal materials have been ordered. The Special Master recommends that such an inventory be conducted personally by Mr. Stephen Yost in cooperation with Professor Berkowitz in order to obtain completely reliable data. Steps must be taken to bring both facilities up to department standards as quickly as possible. As the new library is being developed in the honor dormitory, it is essential that the institution's librarian assume complete responsibility for cataloguing, shelving, and maintaining records with respect to all volumes received. Inmate law clerks in both facilities must be taught to maintain the collections by inserting pocket part supplements, replacement volumes, etc. Regular and frequent inspections of both facilities by the institution's librarian are necessary in order to be certain that the libraries are clean and usable at all times.

As inmates assigned to work in either law library leave the institution or are reassigned, it is necessary that steps be taken to assign new men to these jobs as quickly as possible so that the flow of legal services to inmates will continue without interruption. In addition, steps must be taken at once to provide inmate law clerks with greater and easier access to the inmates for whom they are doing legal work. A procedure for accomplishing this should be the responsibility of the Director of Education who is responsible for all library operations in the institution.

It is the recommendation of the Special Master that the institution consider the feasibility of making improved photocopy facilities available to inmate law clerks for the duplication of legal documents. Inmates for whom the service is used should be charged the actual cost of the service, and a cash slip system of payment should be devised. All copying should be done in such a manner as to protect the confidentiality of the documents involved while permitting the institution to meet its legitimate security needs.

## PARAGRAPH 3

No difficulties have been reported by inmates with respect to provision of supplies in connection with legal proceedings in which they are involved. Adequate supplies are on hand in the institution's two law libraries; in addition notarial services are available in both units on a regular basis. One inmate experienced difficulty in obtaining notarization of a document by the Notary Public serving the honor dormitory. The Special Master investigated the matter

and determined that the staff member was justified in refusing to notarize the document since the last page of the document in chief was almost blank and the signature line was placed on the next page. The document was notarized in its then existing form by a staff member in the stockade. Finally certified postage was made available to inmates for legal mail during the period around Christmas, 1976. This was the institution's first opportunity to rectify earlier noncompliance in this respect which occurred during the Christmas season of 1975.

## CONCLUSIONS

The institution remains in full compliance with all of the provisions of Paragraph 3 of the Court's Order of September 12, 1972.

## PARAGRAPH 4

Between August 9, 1976 and December 31, 1976, 43 incoming publications were screened by the Publication Screening Committee at M.C.I. Of this number, the following 32 publications were excluded:

| Date | Name or Nature of Publication | Basis for Exclusion | Committee Vote |
|------|-------------------------------|---------------------|----------------|
| 8/17/76 | "Porno Feast" advertisement | Obscenity | 3-2 |
| 8/20/76 | "Baby Sister – New Step Mother" | Obscenity | 4-0 |
| 8/20/76 | ten books | Obscenity | 4-0 |
| 8/27/76 | September, '76 "Hustler" magazine | Obscenity | 3-0 |
| 9/03/76 | October, '76 "Hustler" magazine | Obscenity | 3-0 |
| 9/03/76 | "High Times" magazine | Clear and present danger | 3-0 |
| 9/10/76 | "National Shmuck" magazine | Obscenity | 2-1 |
| 9/21/76 | "Guns and Ammo" magazine | Clear and present danger | 2-1 |
| 9/24/76 | nude photographs | Obscenity | 3-0 |
| 9/24/76 | advertisements | Obscenity | 3-0 |
| 10/07/76 | "High Times" magazine | Clear and present danger | 3-0 |
| 10/15/76 | November, '76 "Hustler" magazine | Obscenity | 3-0 |
| 10/29/76 | "Amazon" magazine, issue #4 | Obscenity | 3-0 |
| 10/29/76 | "Foto-Rama" magazine, Fall '76 | Obscenity | 3-0 |
| 10/29/76 | articles on manufacturing of drugs | Clear and present danger | 3-0 |
| 11/05/76 | December, '76 "Hustler" magazine | Obscenity | 3-0 |
| 11/26/76 | Swedish erotica film brochure | Obscenity | 3-0 |
| 12/10/76 | January, '77 "Hustler" magazine | Obscenity | 3-0 |
| 12/10/76 | three books | Obscenity | 2-1 |
| 12/23/76 | January, '77 "High Times" magazine | Clear and present danger | 3-0 |
| 12/30/76 | February, '77 "Hustler" magazine | Obscenity | 3-0 |

Apart from materials sent to Columbus in connection with an inmate's appeal from the decision of the institutional Publication Screening Committee, the Special Master has seen all of the excluded publications. All appear arguably to fall within the definition of "obscenity" or "clear and present danger" contained in the standards for exclusion of printed materials adopted by the institution and approved by the Court. See *Taylor v. Perini*, 421 F.Supp. 740, 775–76 (N.D.Ohio 1976). All procedures utilized by the institution's Publication Screening Committee and the composition of that committee remain unchanged from the description contained in the second report of the Special Master. *Id.* at 747–49.

Four decisions of the M.C.I. Publication Screening Committee during this period were appealed to the Department's Publication Screening Committee in Columbus. With the Court's adoption of the second report of the Special Master, the Department's Publication Screening Committee is required to act upon all such appeals within 28 working days from the time of receipt of the appeal. *Taylor v. Perini*, 421 F.Supp. 740, 749 (N.D.Ohio 1976). The following indicates that the Departmental committee

| Publication On Appeal | Date Appeal Received | Decided* | Number of Working Days | Decision |
|---|---|---|---|---|
| Sept., '76 "Hustler" | 9/7 | 9/14 | 5 | Exclusion |
| "Guns and Ammo" | 10/9 | 12/2 | 38 | Exclusion |
| "Foto-Rama" | 10/29 | 12/9 | 26 | Exclusion |
| three books | 12/13 | 1/31 | 35 | Exclusion |

has not been entirely successful in meeting this standard:

Thus, in two of four cases appealed to the Publication Screening Committee, the new and extended deadline for decision has not been met. According to Reverend Frederick R. Silber, the Coordinator/Convenor of the departmental committee, much of this difficulty results from the use of a committee comprised partially of volunteers. Nonetheless, Reverend Silber has agreed to take steps to insure that all future appeals from M.C.I. will be decided within the 28 working day deadline.

A second matter of some concern has arisen at the departmental level since the Court's adoption of the second report of the Special Master. On December 21, 1976, the Department filed Administrative Regulation 5120–9–19 on the subject of *Printed Materials*. See Appendix J, page 633 *in-* *fra*. The new Administrative Regulation permits exclusion based upon a finding of "obscenity" or "clear and present danger", and the criteria for these standards are the same as those utilized by the Publication Screening Committee at M.C.I. Thus in these respects, departmental and institutional policies are consonant. In several very important respects, however, the new Administrative Regulation is inconsistent with the requirements of the Court's order in *Taylor v. Perini*. For example, while the Court's order requires the admission of printed material from any source, section (B) of the Administrative Regulation continues the earlier policy of requiring prior approval of the managing officer or his designee in the case of printed material not received directly from a publisher or distributor. Section (B)(1) of the Administrative Regulation treats all pre-recorded magnetic tapes as printed materials, although

---

* This column reflects the date the decision of the departmental committee is delivered to the af- fected inmate by the Chairman of M.C.I.'s Publication Screening Committee.

the Court adopted the recommendation of the Special Master in his first report that pre-recorded *personal* (as opposed to commercially recorded) tapes be treated like personal letters and that they be listened to only to the extent necessary to determine that they are personal in nature. *Taylor v. Perini,* 413 F.Supp. 189, 215 (N.D.Ohio 1976). In addition, the Administrative Regulation does not require the use of a three person panel for screening and does not impose a one week limit for decision making by such a panel.

The Special Master is fully aware that the Court's Order in *Taylor v. Perini* does not mandate reform of departmental policies to the extent that those policies are applied to correctional institutions other than Marion Correctional Institution. On the other hand, it should be remembered that the provisions of Paragraph 4—like the rest of the Court's Order in *Taylor v. Perini* —was in effect consented to by the Department of Rehabilitation and Correction. Under these circumstances, the maintenance of one publication screening policy for M.C.I. and a different policy for all other correctional institutions in Ohio is somewhat difficult to understand. Quite apart from the utility of such a double standard, its application is likely to bring about confusion on the part of officials at M.C.I. and to affect in an adverse manner the excellent record of compliance which has emerged over the past nine months. Finally, in the opinion of the Special Master, the adoption of the new Administrative Regulation does not auger well for continued compliance at M.C.I. once the Court has terminated its jurisdiction in *Taylor v. Perini.*

At the request of the Special Master, Director Denton has ordered that Administrative Regulation 5120–9–19 be reconsidered with a view toward harmonizing it with the provisions of the Court's Order in *Taylor v. Perini.* In addition, the Director has reminded Superintendent Perini of his obligation to ignore the Administrative Regulation to the extent that it conflicts with the Court's Order.

## CONCLUSIONS

The institution remains in full compliance with the provisions of Paragraph 4 of the Court's Order of September 12, 1972. The Department's Publication Screening Committee, on the other hand, has not yet come into compliance with the requirement that all appeals from adverse decisions at the institutional level be decided by the departmental committee within 28 working days. It is essential that such compliance commence at once. Finally, the adoption of newly revised Administrative Regulation 5120–9–19 has created a number of potential problems with respect to the institution's continued compliance with this paragraph of the Court's Order. It is hoped that these problems will be obviated as a result of the review of the Administrative Regulation which the Department has undertaken.

## PARAGRAPH 5

At the time of the adoption of the second report of the Special Master, the Court granted "the motion of the defendant for a finding of compliance with Paragraph 5 of the September 12, 1972 order . . . with the understanding that the Honor Dormitory Law Library will be completed." *Taylor v. Perini,* 421 F.Supp. 740, 742 (N.D. Ohio 1976). At that time 30 volumes required by the order were not on the shelves at M.C.I. Since the finding of compliance, 12 of these 30 volumes have been placed on the shelves of the institution's library. Of the 18 remaining volumes, nine are on order and nine out of print. Thus, in spite of the Court's earlier conditional finding of compliance, the institution has continued to attempt to come into complete compliance with Paragraph 5.

## PARAGRAPH 6

The Special Master has received a complete draft for a new inmate manual from the institution's training officer. That draft has been edited and partially rewritten by the Assistant to the Special Master. The next step in the development of a new manual providing fair notice of all rules and regulations together with the sanctions for the violation thereof will be the presentation of this draft to staff at M.C.I. for final review.

### CONCLUSIONS

A new inmate manual meeting the requirements of Paragraph 6 of the Court's Order will be ready for publication within 90 days following the submission of this report. The manual will be in looseleaf form to permit up-to-date amendment of rules and regulations as well as the sanctions for violation thereof. The publication and distribution of this manual to the institution's population will constitute full compliance with this paragraph of the Court's Order.

### PARAGRAPH 7

One violation of the 30 day limit on incarceration in a correctional cell within a six month period has occurred since the second report of the Special Master. An inmate by the name of Corbin (139–965) served seven days in a correctional cell from April 29, 1976, until May 6, 1976. He spent an additional 11 days in such a cell between June 23, 1976, and July 3, 1976. He was sentenced once again to a correctional cell on August 17, 1976. Fourteen days later, on August 30, 1976, the Special Master's assistant became aware that the 30 day limit had been exceeded by two days and reported that fact to Superintendent Perini by telephone. Superintendent Perini ordered the immediate release of the inmate, and the release was effected on the same date. At the same time, Mr. Perini issued orders to staff in the institution's record office to notify him whenever a sentence imposed by the Rules Infraction Board would result in

violation of Paragraph 7(a) of the Court's Order.

Subsequently, on November 2, 1976, Mr. Corbin once again entered a correctional cell as a result of his refusal to return to his housing area. He spent five days in the correctional cell until his release on November 7. On that date he had served exactly 30 days within a six month period, and he was transferred to the infirmary where he was placed in a nondisciplinary cell or ward until November 17, 1976, when he was transferred to Southern Ohio Correctional Facility. At the time of the inmate's last incarceration in a correctional cell, it appears that the system adopted to enforce compliance with the Court's limitation operated effectively, and the limit was not exceeded.

Several violations of the "normal medical care" provision of Paragraph 7 occurred in September and December of 1976. It should be recalled that the order in *Taylor v. Perini* was modified in effect by this Court's Order in *Price v. Perini*, issued on January 14, 1976, requiring that "regular visits . . . be made (to the correctional cell area) by the medical staff without the necessity of a request." Three such rounds were not made on both September 17 and 21; no first shift rounds were made on December 1, 2, or 3. These violations were brought to the attention of Mr. C. E. Parker, the Infirmary Administrator, by the Special Master's assistant. On both occasions, Mr. Parker stated that he would take steps to avoid recurrence of the violation.

No other violations of any provision of Paragraph 7 of the Court's Order have been discovered by the Special Master since the expiration of the period covered by his second report.

### CONCLUSIONS

The institution remains in good faith compliance with this paragraph of the Court's Order. While occasional errors may be inevitable, it appears that when Mr. Perini and his staff learn of such violations they take immediate steps to prevent recur-

rence. Because violations did occur with respect to the time limit imposed upon incarceration in a correctional cell and the making of regular medical rounds on all three shifts of each day, it is the recommendation of the Special Master that Superintendent Perini continue to monitor these two areas with great care.

The new full-time education program which was adopted at M.C.I. in order to reduce the number of inmates in need of regular jobs went into effect on or about September 1, 1976, as scheduled. As of December 14, 1976, the new program had reached the following levels of enrollment:

| Program | Enrolled as of December 14, 1976 | Program Capacity |
|---|---|---|
| Adult Basic Education | 71 | 160 |
| General Educational Development (G.E.D.) | 30 | 40 |
| Vocational Education | 81 | 105 |
| College Program | 101 | 75 |
| Total | 283 | 380 |

While 74% of the total program capacity has been reached, this results from substantial overpopulation (135%) in the college program. Only 44% of program capacity has been achieved in the Adult Basic Education program while 75% and 77% of such capacity has been achieved in the G.E.D. and vocational educational programs respectively.

These data do not include 20 vocational students who had been interviewed and approved for entry but who had not passed through the Reclassification Committee at that time. Adult Basic Education, the program with the lowest enrollment in the educational department, is the only element which is not on schedule according to the Director of Education at M.C.I. By March 1, 1977, the Director of Education predicts that capacity enrollment in all programs except A.B.E. can be achieved and that between 100 and 125 residents can be participating in the A.B.E. program.

No overall plan of compliance has been adopted with respect to the development of objective and reviewable written procedures relating to assignment, promotion, transfer, and removal of inmates to and from job assignments. Such a plan is in the process of development, however, and will be submitted to the Court within 60 days of the confirmation of this report. The first step in the development of a compliance plan is almost complete at this time. This involves the development of reliable job descriptions for all work assignments in the institution. In order to obtain this information, Professor Timothy Heinsz in his capacity as consultant prepared forms for completion by all job supervisors in the prison. When these were received, a number of supervisors were contacted personally to clear up ambiguity in the job descriptions which they submitted. Subsequently, members of the two inmate councils were asked to prepare descriptions of the same jobs. These have been received, and Professor Heinsz is now in the process of developing final descriptions. These in turn will be submitted to job supervisors for final critique. The job descriptions which emerge from this process will meet the mandate of Paragraph 8(a) of the Court's Order which requires "precisely worded, job related substantive criteria for job assignment, transfer and removal."

The heart of the difficulty with respect to Paragraph 8 lies in the substance of subsection (d):

There must be defined procedures for making job assignments, transfers and removals according to the specified substantive criteria, which procedures:

1) Shall provide for centralized responsibility for making such assignments;
2) Shall not allow for deference to the wishes of job supervisors or fellow inmates;
3) Shall not be dependent upon the self-initiative of inmates.

Any plan of compliance must take into account the phenomenon of intra-shop as well as inter-shop transfers and initial assignments. The system which is finally adopted should be as simple and uncomplicated as possible and should be designed to make it possible for inmates with the qualifications and desire for self-improvement to progress to a job which is useful and challenging. A fair system of job assignment, promotion, transfer, and removal should produce a reasonable degree of racial balance within all employment units in the institution. Finally, the system must eliminate all vestiges of power held by some inmates over job assignments which results in their ability to sell such jobs to other inmates.

The development of a compliance plan to accomplish all of these objectives will not be a simple task. Indeed, there is an element of contradiction inherent in these multiple objectives. As a result, the plan which emerges will be submitted to the Court and to all of the parties to this litigation before attempts at implementation are made.

Job assignment data have been included in each of the previous reports of the Special Master. The following data represent levels of employment in all employment units in the main stockade as of late December, 1976. As of December 31, 1976, 1135 inmates were incarcerated in the main stockade. Of these, 514 (45.3%) were white and 621 (54.7%) were black. The following data account for 1048 inmates in this unit of the institution.

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Administrative Packages | Carrier | 1 | 0 | 100 | 0 |
| Arts & Crafts | Clerk | 0 | 1 | 0 | 100 |
| Automobile Body School | Porter | 1 | 2 | 33 | 67 |
| | Office Clerk | 0 | 1 | 0 | 100 |
| | Toolroom Clerk | 1 | 0 | 100 | 0 |
| | Student | 4 | 6 | 40 | 60 |
| Total | | 6 | 9 | 40 | 60 |
| Automobile Mechanics School | Office Clerk | 0 | 1 | 0 | 100 |
| | Toolroom Clerk | 1 | 1 | 50 | 50 |
| | Porter | 1 | 0 | 100 | 0 |
| | Utility | 2 | 3 | 40 | 60 |
| | Student | 2 | 4 | 33 | 67 |
| Total | | 6 | 9 | 40 | 60 |
| Barbers | Cellblocks | 3 | 3 | 50 | 50 |
| | Dormitories | 9 | 2 | 82 | 18 |
| | Officers' Barber | 1 | 0 | 100 | 0 |
| Total | | 13 | 5 | 72 | 28 |
| Cafeteria (Stockade) | Floor workers | 11 | 5 | 69 | 31 |
| | Floor tank workers | 6 | 0 | 100 | 0 |
| | Serving line workers | 8 | 8 | 50 | 50 |

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Cafeteria (Stockade) Cont'd. | Menu Board workers | 1 | 1 | 50 | 50 |
| | Coffee makers | 2 | 0 | 100 | 0 |
| | Set-up men | 1 | 1 | 50 | 50 |
| | Bread room workers | 2 | 0 | 100 | 0 |
| | Diet kitchen workers | 3 | 1 | 75 | 25 |
| | Pot & grill workers | 3 | 3 | 50 | 50 |
| | Pan room workers | 7 | 1 | 88 | 12 |
| | Dish room workers | 11 | 3 | 79 | 21 |
| | Garbage dock workers | 4 | 0 | 100 | 0 |
| | Creamery workers | 0 | 4 | 0 | 100 |
| | Cooks | 13 | 8 | 62 | 38 |
| | Porters | 7 | 5 | 58 | 42 |
| | Sugar server | 0 | 1 | 0 | 100 |
| | Maintenance | 0 | 1 | 0 | 100 |
| | Refrigeration | 0 | 1 | 0 | 100 |
| | Extra help | 4 | 3 | 57 | 43 |
| | Men in court (this date) | 2 | 0 | 100 | 0 |
| | Men in court (C.C.) | 1 | 0 | 100 | 0 |
| | Men in court (Hospital) | 1 | 0 | 100 | 0 |
| | Office Clerks | 1 | 2 | 33 | 67 |
| | Office porter | 1 | 0 | 100 | 0 |
| | Clothing Room | 1 | 1 | 50 | 50 |
| | Ice cream mixer | 0 | 1 | 0 | 100 |
| | Cafe table set up | 1 | 0 | 100 | 0 |
| | Store room workers | 0 | 2 | 0 | 100 |
| | Officer cafe workers | 4 | 1 | 80 | 20 |
| | Vegetable room workers | 1 | 5 | 17 | 83 |
| | Bakery shop workers | 4 | 4 | 50 | 50 |
| | Butcher shop workers | 2 | 8 | 20 | 80 |
| | Silverware & cup man | 1 | 0 | 100 | 0 |
| | Night cleaners | 3 | 0 | 100 | 0 |
| Total | | 106 | 70 | 60 | 40 |
| Captains Office | Clerk runners | 1 | 2 | 33 | 67 |
| Carpenter shop | Carpenter | 1 | 3 | 25 | 75 |
| | Chair repair | 0 | 1 | 0 | 100 |
| | Carpenter helper | 2 | 2 | 50 | 50 |
| | Washroom porter | 1 | 0 | 100 | 0 |
| | Porter | 2 | 0 | 100 | 0 |
| Total | | 6 | 6 | 50 | 50 |

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Chapel | Clerk & runner (Catholic) | 0 | 1 | 0 | 100 |
| | Clerk & server | 0 | 1 | 0 | 100 |
| | Clerk (Protestant) | 0 | 1 | 0 | 100 |
| | Porter | 1 | 0 | 100 | 0 |
| Total | | 1 | 3 | 25 | 75 |
| Clerks (Housing areas) | Dorm Clerks | 8 | 5 | 62 | 38 |
| | Cellblock clerks | 1 | 4 | 20 | 80 |
| Total | | 9 | 9 | 50 | 50 |
| Commissary | TV/Radio Technician | 0 | 1 | 0 | 100 |
| | Stockroom & Clerk | 0 | 1 | 0 | 100 |
| | Clerks | 6 | 3 | 67 | 33 |
| Total | | 6 | 5 | 55 | 45 |
| Custodial School (Hall Porters | Day halls | 3 | 3 | 50 | 50 |
| | Shop area | 3 | 3 | 50 | 50 |
| | Night halls | 4 | 0 | 100 | 0 |
| | Semi-honor | 4 | 4 | 50 | 50 |
| | Office porters | 13 | 7 | 65 | 35 |
| Total | | 27 | 17 | 61 | 39 |
| Dental Clinic | Dental Clinic | 1 | 1 | 50 | 50 |
| | Dental Lab | 1 | 2 | 33 | 67 |
| Total | | 2 | 3 | 40 | 60 |
| Deputy's Office | Clerks | 5 | 3 | 63 | 37 |
| Education Office | Clerks | 3 | 3 | 50 | 50 |
| | Porter | 5 | 3 | 63 | 37 |
| Total | | 8 | 6 | 57 | 43 |
| Education | ABE students | 30 | 26 | 54 | 46 |
| | GED students | 21 | 6 | 78 | 22 |
| Total | | 51 | 32 | 61 | 39 |
| Electric Shop | Clerk | 1 | 0 | 100 | 0 |
| | Motor repair | 0 | 1 | 0 | 100 |
| | Electrician | 0 | 1 | 0 | 100 |
| | Elect. helper | 1 | 3 | 25 | 75 |
| Total | | 2 | 5 | 29 | 71 |
| Fire Inspector | Clerk | 0 | 1 | 0 | 100 |
| | Inspector | 0 | 1 | 0 | 100 |
| | Fireman | 1 | 0 | 100 | 0 |
| Total | | 1 | 2 | 33 | 67 |

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Furniture Factory | Office Clerk | 1 | 0 | 100 | 0 |
| | Storeroom Clerk | 0 | 1 | 0 | 100 |
| | Porters | 5 | 0 | 100 | 0 |
| | Saw Operator | 2 | 3 | 40 | 60 |
| | Planer Operator | 3 | 0 | 100 | 0 |
| | Glue Wheel Oper. | 2 | 0 | 100 | 0 |
| | Vert. Drill Oper. | 0 | 2 | 0 | 100 |
| | Shaper Operator | 0 | 2 | 0 | 100 |
| | Router Operator | 2 | 0 | 100 | 0 |
| | Sander Operator | 1 | 3 | 25 | 75 |
| | Spray Booth | 1 | 0 | 100 | 0 |
| | Mach. helpers | 1 | 2 | 33 | 67 |
| | Chair & Desk Assembly | 11 | 7 | 61 | 39 |
| | Hand Sanders | 5 | 0 | 100 | 0 |
| Total | | 34 | 20 | 63 | 37 |
| Garmet Shop | Clerk | 0 | 1 | 0 | 100 |
| | Mechanic | 0 | 1 | 0 | 100 |
| | Cutter | 2 | 0 | 100 | 0 |
| | Porter | 2 | 0 | 100 | 0 |
| | Lineman | 1 | 0 | 100 | 0 |
| | Inspector | 1 | 0 | 100 | 0 |
| | Folder | 1 | 1 | 50 | 50 |
| | Trimmer | 4 | 0 | 100 | 0 |
| | Mach. Operator | 9 | 4 | 69 | 31 |
| Total | | 20 | 7 | 74 | 26 |
| Identification | Darkroom | 0 | 3 | 0 | 100 |
| | Photographer | 0 | 2 | 0 | 100 |
| | Clerks | 2 | 0 | 100 | 0 |
| | Clerk helpers | 2 | 0 | 100 | 0 |
| | Runners | 2 | 0 | 100 | 0 |
| | Porters | 0 | 2 | 0 | 100 |
| | Project Image | 1 | 0 | 100 | 0 |
| | School (ABE) | 1 | 0 | 100 | 0 |
| | Infirmary | 0 | 1 | 0 | 100 |
| Total | | 8 | 8 | 50 | 50 |
| Infirmary | Treatment Room Aides | 1 | 4 | 20 | 80 |
| | Ward Aides | 5 | 2 | 71 | 29 |
| | Clerks | 2 | 5 | 29 | 71 |
| | Runner | 1 | 0 | 100 | 0 |
| | Clothing men | 2 | 0 | 100 | 0 |
| | Lab technicians | 0 | 2 | 0 | 100 |
| | X-ray technicians | 0 | 2 | 0 | 100 |

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Infirmary—Continued | Physical therapy assistants | 2 | 0 | 100 | 0 |
| | Porters | 6 | 2 | 75 | 25 |
| Total | | 19 | 17 | 53 | 47 |
| Inmate Liaison Officer | Clerk-Runner | 0 | 1 | 0 | 100 |
| Inmate Personnel | Clerk-Runner | 2 | 4 | 33 | 67 |
| Institution Storeroom | Clerks | 2 | 2 | 50 | 50 |
| | Stockmen | 1 | 1 | 50 | 50 |
| | Porters | 2 | 0 | 100 | 0 |
| | Dock workers | 5 | 6 | 45 | 55 |
| Total | | 10 | 9 | 53 | 47 |
| Laundry | Clerk-Runner | 1 | 2 | 33 | 67 |
| | Runner | 1 | 3 | 25 | 75 |
| | Maintenance | 0 | 2 | 0 | 100 |
| | Coordinator | 0 | 1 | 0 | 100 |
| | Clothing room | 0 | 3 | 0 | 100 |
| | Washers | 3 | 1 | 75 | 25 |
| | Pullers | 4 | 1 | 80 | 20 |
| | Extractor | 0 | 1 | 0 | 100 |
| | Drier | 0 | 1 | 0 | 100 |
| | Pants presser | 3 | 0 | 100 | 0 |
| | Porter | 2 | 0 | 100 | 0 |
| | Sock-Runner | 0 | 1 | 0 | 100 |
| | Shirt presser | 10 | 2 | 83 | 17 |
| | Dry cleaner | 0 | 1 | 0 | 100 |
| | Mangle | 6 | 7 | 46 | 54 |
| Total | | 30 | 26 | 54 | 46 |
| Library | Law clerk | 1 | 1 | 50 | 50 |
| | Law clerk typist | 0 | 1 | 0 | 100 |
| | Listening center clerk | 0 | 1 | 0 | 100 |
| | Shelf clerk | 1 | 0 | 100 | 0 |
| | Record clerk | 0 | 1 | 0 | 100 |
| | Circ. Clerk | 1 | 0 | 100 | 0 |
| | Porter | 1 | 0 | 100 | 0 |
| Total | | 4 | 4 | 50 | 50 |
| Maintenance | Clerk | 0 | 1 | 0 | 100 |
| | Cafe. Maint. | 0 | 1 | 0 | 100 |
| | Masonry & Gen. Repair | 6 | 2 | 75 | 25 |
| | Furnace Repair | 0 | 1 | 0 | 100 |
| | Heating & Air Cond. | 0 | 3 | 0 | 100 |
| | Refrigeration | 0 | 2 | 0 | 100 |
| | Roof Maint. | 2 | 3 | 40 | 60 |
| Total | | 8 | 13 | 38 | 62 |
| Masonry | Office Clerk | 1 | 0 | 100 | 0 |
| | Tool Clerk | 0 | 1 | 0 | 100 |
| | Porter | 0 | 1 | 0 | 100 |
| Total | | 1 | 2 | 33 | 67 |

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Newgate College | Students | 61 | 32 | 66 | 34 |
| | Clerk | 1 | 0 | 100 | 0 |
| Total | | 62 | 32 | 66 | 34 |
| Paint Shop | Clerk | 0 | 1 | 0 | 100 |
| | Glazer | 0 | 1 | 0 | 100 |
| | Glazer helper | 1 | 0 | 100 | 0 |
| | Painter | 2 | 3 | 40 | 60 |
| | Painter helper | 2 | 0 | 100 | 0 |
| | Sign Painter | 0 | 1 | 0 | 100 |
| Total | | 5 | 6 | 45 | 55 |
| Plumbing Shop | Clerk | 1 | 0 | 100 | 0 |
| | Lift Station | 0 | 1 | 0 | 100 |
| | Welder | 0 | 1 | 0 | 100 |
| | 24 hr. plumber | 1 | 0 | 100 | 0 |
| | General plumber | 6 | 4 | 60 | 40 |
| Total | | 8 | 6 | 57 | 43 |
| Porters | Dorm porters | 29 | 17 | 63 | 37 |
| | Cellblock | 11 | 13 | 46 | 54 |
| Total | | 40 | 30 | 57 | 43 |
| Print Shop | Print shop workers | 2 | 0 | 100 | 0 |
| Program Office Clerks | Jaycee clerk | 1 | 0 | 100 | 0 |
| | A.A. clerk | 0 | 1 | 0 | 100 |
| Total | | 1 | 1 | 50 | 50 |
| Psychological Services | Clerks | 2 | 2 | 50 | 50 |
| Quartermaster | Head clerk | 0 | 1 | 0 | 100 |
| | Stock clerk | 0 | 1 | 0 | 100 |
| | Outside clothing tailor | 0 | 1 | 0 | 100 |
| | H.D., Cafe, Inf. Clothing counter workers | 2 | 1 | 67 | 33 |
| | Tailors | 1 | 2 | 33 | 67 |
| | Repair clothes & machines | 2 | 0 | 100 | 0 |
| | Shoe shop | 1 | 0 | 100 | 0 |
| | Presser | 1 | 0 | 100 | 0 |
| | Porters | 3 | 1 | 75 | 25 |
| Total | | 11 | 7 | 61 | 39 |
| Radio & TV School | Students | 7 | 8 | 47 | 53 |
| | Maintenance | 3 | 2 | 60 | 40 |
| | Utility | 0 | 1 | 0 | 100 |
| | Clerk | 0 | 1 | 0 | 100 |
| Total | | 10 | 12 | 45 | 55 |
| Recreation | Clerk | 1 | 2 | 33 | 67 |
| | Porter | 2 | 0 | 100 | 0 |
| | First Aid | 1 | 1 | 50 | 50 |
| | Equipment room | 4 | 2 | 67 | 33 |
| | Gen. Clean-up | 17 | 19 | 47 | 53 |
| Total | | 25 | 24 | 51 | 49 |

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Residential Wiring School | Students | 5 | 4 | 55 | 45 |
| | Office Clerk | 1 | 0 | 100 | 0 |
| | Tool room clerk | 1 | 0 | 100 | 0 |
| Total | | 7 | 4 | 64 | 36 |
| Sheet Metal Shop | Wash tanks | 2 | 0 | 100 | 0 |
| | Shears | 1 | 1 | 50 | 50 |
| | Tool Room | 0 | 2 | 0 | 100 |
| | Spray painter | 6 | 1 | 86 | 14 |
| | Clerks | 2 | 1 | 67 | 33 |
| | Porters | 0 | 4 | 0 | 100 |
| | Punch press | 0 | 2 | 0 | 100 |
| | Press break | 2 | 2 | 50 | 50 |
| | Cabinet assembly | 8 | 0 | 100 | 0 |
| | Utility | 0 | 2 | 0 | 100 |
| | Grinder | 2 | 1 | 67 | 33 |
| | Chair assembly | 5 | 1 | 83 | 17 |
| | Cutoff saw | 0 | 3 | 0 | 100 |
| | Binder | 0 | 1 | 0 | 100 |
| | Drill Press | 1 | 0 | 100 | 0 |
| | Welders | 3 | 3 | 50 | 50 |
| Total | | 33 | 24 | 58 | 42 |
| Social Services | Clerks | 3 | 2 | 60 | 40 |
| | Clerk typists | 1 | 2 | 33 | 67 |
| Total | | 4 | 4 | 50 | 50 |
| Tool Room | Clerk | 0 | 1 | 0 | 100 |
| | Porter | 3 | 0 | 100 | 0 |
| | Locksmith | 0 | 1 | 0 | 100 |
| | Repairmen | 0 | 2 | 0 | 100 |
| Total | | 3 | 4 | 43 | 57 |
| Trash Run | Trash crew | 5 | 0 | 100 | 0 |
| Treatment | Clerk | 0 | 1 | 0 | 100 |
| Training | Clerk | 0 | 1 | 0 | 100 |
| Welding School | Clerk | 0 | 1 | 0 | 100 |
| | Tool room clerk | 0 | 1 | 0 | 100 |
| | Maintenance | 0 | 1 | 0 | 100 |
| | Porter | 0 | 1 | 0 | 100 |
| | Temp. porter | 1 | 0 | 100 | 0 |
| | Temp. tool room clerk | 1 | 0 | 100 | 0 |
| | Student | 7 | 9 | 47 | 53 |
| Total | | 9 | 13 | 36 | 64 |

Comparison of these data with racial percentages in the overall population indicates that while many employment units reflect reasonable racial balance, others (e. g., barbers, the garment shop, and maintenance) continue to reflect a high degree of racial imbalance.

As of December 31, 1976, 209 inmates were incarcerated in the honor dormitory. Of these, 79 (37.8%) were white and 130 (62.2%) were black. The following data account for 222 inmates in this unit of the institution. That the data account for more inmates than are indicated as living in the

honor dormitory is explained by the fact that total population is reported to the Special Master at the end of each month. The population level at the honor dormitory declined steadily during the month of December (as supervisors reported employment totals in their shops) as virtually no new inmates were assigned to this unit during the month. Inmates were released from the honor dormitory in December, however, as the result of parole.

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Cafeteria | Cooks | 5 | 0 | 100 | 0 |
| | Dishwashers | 1 | 2 | 33 | 67 |
| | Kitchen porters | 1 | 1 | 50 | 50 |
| | Dining room porters | 2 | 0 | 100 | 0 |
| | Pots & Pans | 1 | 1 | 50 | 50 |
| | Vegetable room | 1 | 1 | 50 | 50 |
| Total | | 11 | 5 | 69 | 31 |
| Clark's Garden Gang | Waterboy | 0 | 1 | 0 | 100 |
| | Laborers | 4 | 5 | 44 | 56 |
| Total | | 4 | 6 | 40 | 60 |
| Coy's Tractor Gang | Tractor driver | 3 | 4 | 43 | 57 |
| | Mechanic | 0 | 1 | 0 | 100 |
| Total | | 3 | 5 | 38 | 62 |
| Dairy Barn | Clerk | 1 | 0 | 100 | 0 |
| | Feeder | 2 | 2 | 50 | 50 |
| | Milker washer | 1 | 0 | 100 | 0 |
| | Truck driver | 1 | 1 | 50 | 50 |
| | Night man | 0 | 1 | 0 | 100 |
| | Calf Barn | 0 | 3 | 0 | 100 |
| | Laborer | 6 | 2 | 75 | 25 |
| | Milker | 8 | 2 | 80 | 20 |
| Total | | 19 | 11 | 63 | 37 |
| Ewing's Hog Lot | Feed sows | 1 | 0 | 100 | 0 |
| | Night farrowing barn | 1 | 0 | 100 | 0 |
| | Day farrowing barn | 0 | 1 | 0 | 100 |
| | Tractor driver | 0 | 1 | 0 | 100 |
| | Where & if needed | 4 | 3 | 43 | 57 |
| Total | | 6 | 5 | 55 | 45 |
| M.C.I. Garage | Gas pump operator | 1 | 0 | 100 | 0 |
| | Mechanics | 1 | 1 | 50 | 50 |
| | Heavy Equip. Mech. | 0 | 1 | 0 | 100 |
| | Heavy Equip. Oper. | 1 | 0 | 100 | 0 |
| | Tool room man | 0 | 1 | 0 | 100 |
| | Wash rack man | 1 | 0 | 100 | 0 |
| | Licensed drivers | 4 | 0 | 100 | 0 |
| | Non-licensed drivers | 2 | 2 | 50 | 50 |
| | Fire Department | 0 | 2 | 0 | 100 |
| | Landfill operators | 2 | 0 | 100 | 0 |
| | Parole processing | 0 | 1 | 0 | 100 |
| Total | | 12 | 8 | 67 | 33 |

| Shop | Job | # Black | # White | % Black | % White |
|------|-----|---------|---------|---------|---------|
| Honor Dormitory Help | Clerks | 0 | 2 | 0 | 100 |
| | Visiting Room | 2 | 0 | 100 | 0 |
| | Maintenance | 0 | 2 | 0 | 100 |
| | Trash truck | 2 | 1 | 67 | 33 |
| | Dorm porter | 6 | 3 | 67 | 33 |
| | Law Library | 1 | 1 | 50 | 50 |
| | Librarian | 1 | 0 | 100 | 0 |
| | Clothing room | 1 | 0 | 100 | 0 |
| | Barber | 1 | 0 | 100 | 0 |
| | Nurse | 1 | 1 | 50 | 50 |
| | Laundry | 1 | 0 | 100 | 0 |
| | Social Service clerk | 1 | 0 | 100 | 0 |
| Total | | 15 | 10 | 60 | 40 |
| Frank's Farm Gang | Waterboy | 1 | 0 | 100 | 0 |
| (previously Newlands) | Laborers | 3 | 0 | 100 | 0 |
| Total | | 4 | 0 | 100 | 0 |
| O.P.I. Warehouse | Truck driver | 0 | 2 | 0 | 100 |
| | Warehouse clerk | 1 | 0 | 100 | 0 |
| Total | | 1 | 2 | 33 | 67 |
| Power Plant | Fireman's Helper | 1 | 2 | 33 | 67 |
| | Maintenance helper | 1 | 0 | 100 | 0 |
| | Clerk | 0 | 1 | 0 | 100 |
| | Chemist | 0 | 1 | 0 | 100 |
| | Ash crew | 2 | 1 | 67 | 33 |
| | Coal crew | 2 | 1 | 67 | 33 |
| | Porter | 2 | 1 | 67 | 33 |
| Total | | 8 | 7 | 53 | 47 |
| Sally Port | Runners | 1 | 1 | 50 | 50 |
| | Gate pusher | 2 | 1 | 67 | 33 |
| Total | | 3 | 2 | 60 | 40 |
| Wagner's Farm Gang | Waterboy | 1 | 0 | 100 | 0 |
| | Laborer | 4 | 2 | 67 | 33 |
| Total | | 5 | 2 | 71 | 29 |
| Witzel's Gang | Yardman | 0 | 1 | 0 | 100 |
| | Farm clerk-driver | 0 | 1 | 0 | 100 |
| | Granary help | 1 | 1 | 50 | 50 |
| | Carpenter driver | 0 | 1 | 0 | 100 |
| Total | | 1 | 4 | 20 | 80 |
| Validation Plant | Press operator | 3 | 1 | 75 | 25 |
| | Baggers | 9 | 9 | 50 | 50 |
| | Inspectors | 13 | 4 | 76 | 24 |
| | Cutters | 3 | 2 | 60 | 40 |
| | Oven | 1 | 1 | 50 | 50 |
| | Maintenance | 0 | 1 | 0 | 100 |
| | Janitor | 3 | 0 | 100 | 0 |
| | Shipping | 1 | 1 | 50 | 50 |
| | Clerks | 2 | 0 | 100 | 0 |
| Total | | 35 | 19 | 65 | 35 |
| Yardmen | Yardmen | 4 | 5 | 44 | 56 |

Again, these data, when compared to racial percentages in the honor dormitory population, indicate that substantial racial disparity continues to exist in a number of

employment units. E. g., Coy's tractor gang, the power plant, and Witzel's gang.

## CONCLUSIONS

Within 60 days after the confirmation of this report, the Special Master will submit a complete compliance plan to the Court and the parties for their review. Precisely worded, job related substantive criteria for job assignment, transfer, and removal will be completed by that time as well. The compliance plan will concentrate upon subsection (d) of Paragraph 8, as earlier reports of the Special Master have indicated that the institution is basically in compliance with subparagraphs (b) and (c).

## PARAGRAPH 9

Compliance with respect to this paragraph of the Court's Order has been defined in terms of achievement of racial balance in each of the affected employment units which reflects the racial balance of the overall stockade population allowing for a deviation factor of ± 10%. In addition fair balance is required with respect to intra-shop assignments in certain of the larger employment units such as the hospital, the laundry, and the cafeteria.

As of late December, 1976, percentage by race in the affected employment units was as follows:

| Employment Unit | % Black | % White |
|---|---|---|
| Office Workers | 44 | 56 |
| Porters | 62 | 38 |
| Plumbing Shop | 57 | 43 |

| Employment Unit | % Black | % White |
|---|---|---|
| Electric Shop | 29 | 71 |
| Carpenter Shop | 50 | 50 |
| Commissary | 55 | 45 |
| Hospital (Infirmary) | 53 | 47 |
| Dental Clinic | 40 | 60 |
| Cafeteria (stockade) | 60 | 40 |
| Laundry | 54 | 46 |
| Trash Run | 100 | 0 |
| Custodial School | 61 | 39 |

As of December 31, 1976, the percentage of black inmates in the stockade was 54.7 and the percentage of white inmates was 45.3. Taking into account the allowed 10% deviation factor, the following employment units are now in overall compliance with Paragraph 9 of the Court's Order: porters, the plumbing shop, the carpenter shop, the commissary, the hospital, the stockade cafeteria, the laundry, and the custodial school. In addition, the Dental Clinic should be regarded as being in compliance in view of the small number of inmates employed in this unit. Of the five inmates working in the Dental Clinic, three are white and two are black. The Special Master has agreed with the position put forward by the institution that when apparent racial imbalance (measured in percentages) is the result of the assignment of one individual of a particular race to a very small employment unit, such imbalance is more illusory than real.

Employment units which are not in compliance are office workers, the electric shop, and the trash run. The following data indicate the progress or lack of progress which has been made in these three employment units since the first report of the Special Master:

| | First Report | | Second Report | | Third Report | |
|---|---|---|---|---|---|---|
| | % Black | % White | % Black | % White | % Black | % White |
| Office Workers | 42 | 58 | 43 | 57 | 44 | 56 |
| Electric Shop | 27 | 73 | 27 | 73 | 29 | 71 |
| Trash Run | 67 | 33 | 88 | 12 | 100 | 0 |

Thus, improvement with respect to office workers and the electric shop has been slight. On the other hand, racial imbalance in the trash run has increased steadily over the course of the past nine months. The figures reported for this employment unit, however, are somewhat misleading. Shortly before the Special Master called for the data reported above, two black inmates working in the trash run were paroled and a third left to become a full-time participant in the institution's college program.

These three openings have not been filled as of the date of this report.

Although overall employment figures in the stockade cafeteria, the hospital (infirmary), and the laundry indicate compliance within the 10% deviation factor which is allowed, significant imbalance remains with respect to certain job assignments within each of these employment units. For example, 11 (79%) dishroom workers in the cafeteria are black while three (21%) are white; seven (88%) pan room workers in that unit are black and one (12%) is white. Six (75%) porters in the infirmary are black while two (25%) are white; on the other hand, two (29%) of the clerks in that unit are black and five (71%) are white. In the laundry, ten (83%) shirt pressers are black and two (17%) are white; in the same employment unit, four (80%) pullers are black and one (20%) is white.

## CONCLUSIONS

Significant improvement has been made since the confirmation of the second report of the Special Master in bringing more of the affected employment units into balance with the overall racial breakdown of the institution's population. Whereas only two units were in compliance at the time of the second report, nine are now in compliance. Progress with respect to office workers and the electric shop must be increased, and the deteriorating situation in the trash run must be reversed as quickly as possible. More attention must be given by the M.C.I. administration to internal imbalance with respect to certain jobs in the stockade cafeteria, the infirmary, and the laundry.

## PARAGRAPH 10

The Special Master is in a position to report substantial progress in the development and implementation of compliance plans meeting the requirements of various subparagraphs of this portion of the Court's Order.

Since the confirmation of the second report of the Special Master, a new staff manual has been prepared by M.C.I.'s personnel officer. This manual contains a clear and complete statement of the institution's policy prohibiting all forms of racial discrimination, harassment, intimidation and insult. Sanctions for violations of this policy are spelled out in detail. The new manual contains references to state and federal law prohibiting discriminatory conduct against inmates as well as an outline of the new inmate grievance mechanism discussed in detail in connection with the prohibitory paragraphs of the Court's Order *supra*. The Special Master has approved the contents of the new staff manual, and printing will be underway in the near future.

Very substantial progress has been made by Personnel Decisions Research Institute to develop methods for selection and training of candidates for staff positions at M.C.I. As the result of a recommendation by those psychologists, the Court ordered that Paragraph 10(d) of its original Order be amended to read as follows:

A plan for the pre-hire administration to candidates for correctional officer positions of psychological screening procedures designed to disclose emotional instability, inability to take effective action under stress, likelihood of inappropriate use of force, excessive authoritarian attitudes, or tendency to engage in unjustified differential treatment toward inmates based upon race or national origin, with the objective of assessing propensity for racism, sadism, or brutality, and to assist in selecting candidates most likely to have a helpful, client-service orientation.

All parties agreed to the amended language of this subparagraph.

Psychologists from Personnel Decisions Research Institute have visited M.C.I. three times since they were employed to develop a compliance plan for Paragraph 10(d). As of early December, they had made the following progress:

. . . P.D.R.I. completed its literature review and submitted a draft version to the Special Master. In general, the review concluded that the findings "seem to indicate that a personality inventory that measures mental health, self-control,

maturity, self-esteem, incorporation of society's rules, and independence or autonomy might be useful." In summary, the literature review indicated that "the knowledge gained (by previous studies) has not been the kind that enables us to ·put into effect proven selection techniques for a well studied occupational role followed up by effective training to optimize job performance."

. . . A job analysis questionnaire was submitted to a number of correctional officers and supervisors at M.C.I. Job analysis data was obtained as well from interviews of correctional officers, supervisors, and inmates. These data were utilized to prepare a job analysis of the correctional officer position at M.C.I., and a draft version of the analysis was reviewed by a panel of correctional officers and supervisors at M.C.I. A final draft of the job analysis is now in the process of preparation.

. . . Interviews with correctional officers, supervisors, and inmates have been held to obtain information necessary for the development of behavioral dimensions of correctional officer performance. In order to accomplish this, P.D.R.I. attempted to identify "critical incidents" which .occur within the prison as well as staff and inmate conceptions of appropriate and inappropriate responses thereto.

. . . P.D.R.I. has developed a tentative screening battery consisting of (a) a routine check of law enforcement records, (b) the Minnesota Multiphasic Personality Inventory, (c) the Employee Aptitude Survey—Verbal Comprehension, (d) the Differential Aptitude Test—Abstract Reasoning, and (e) Gough's Adjective Check List. The M.M.P.I. and Adjective Check List are designed to measure the personality of applicants. The Employee Aptitude Survey—Verbal Comprehension and the Differential Aptitude Survey—Abstract Reasoning are being utilized to measure intelligence to aid in interpreting the personality measures. The routine check of law enforcement records is designed to identify persons who have a history of physically violent behavior.

. . . As of mid-December, the tentative screening battery had been administered to 30 applicants for correctional officer positions at M.C.I. P.D.R.I. is now in the progress of scoring and evaluating these test scores with a view toward recommending temporary selection procedures. Once this is accomplished, all applicants for correctional officer positions at M.C.I. will be required to take the tentative screening battery tests, and scoring and clinical evaluation will be accomplished by P.D.R.I. Selection or nonselection will be based upon the reports of such evaluations. It should be pointed out that scoring and evaluation of tests taken by future applicants fall outside of the scope of P.D.R.I.'s obligations under its contract to develop screening techniques. Thus the Department or M.C.I. will be responsible for the financial costs attendant to such scoring and evaluation. P.D.R.I. intends to submit a cost figure for this service in the near future.

. . . P.D.R.I. has developed a statement of probable experimental battery contents. The experimental battery will be the final work product under P.D.R.I.'s contract with the Special Master. It is denominated "experimental" because of the need to validate the battery.

. . . P.D.R.I. has conducted an analysis of all court tickets written at M.C.I. from January to September, 1976. The study indicated that most correctional officers write very few tickets while a few write a great many. Tickets written by the five most active ticket writers were broken down by race of the inmates ticketed. Finally an analysis was made of the offenses for which tickets are written most frequently.

. . . P.D.R.I. has prepared an exit interview questionnaire and has developed procedures for a face-to-face exit interview for all correctional officers leaving M.C.I. The face-to-face interview is being held with 50% of such persons and the questionnaire is being used for the other 50%. In addition, the exit

questionnaire is being sent to selected groups of previous correctional officers at M.C.I. Finally, follow-up questionnaires will be sent to a sample of those who earlier were given an exit interview or who completed an exit questionnaire.

Special reference should be made to the experimental battery mentioned above. The implementation of this battery will be the final result of P.D.R.I.'s activities under that organization's current contract with the Special Master. The use of this battery, which will begin in the Spring of 1977, will be the final compliance plan for Paragraph 10(d). At the time that the battery is administered to prospective applicants for correctional officer positions, it will be supported by construct validity evidence. This evidence will be based upon the job analysis for correctional officer positions developed by P.D.R.I., the behavioral dimensions of correctional officer job performance, and the use of acknowledged experts to draw rational linkages between job tasks or behavioral dimensions, worker characteristics, and the contents of the experimental battery. In addition to this evidence supporting the construct validity of the battery, P.D.R.I. and the Special Master are in agreement that a follow-up study to provide evidence for the criterion-related validity of the experimental battery should be made. Such a study—known as a longitudinal empirical validation study—will consume between one and a half and two years if Ohio correctional institutions in addition to M.C.I. can be utilized. What the study will do, in simple terms, is to follow the on-the-job behavior of applicants who took the battery to determine whether the battery is in fact identifying those undesirable traits specified in Paragraph 10(d) of the Court's Order. In the absence of such a study, all that anyone can do is to assume that the battery is identifying those characteristics. While such an assumption will be supported by evidence of construct validity, empirical evidence of criterion validity is most desirable.

The cost of such a study will be approximately $60,000. The Special Master has asked P.D.R.I. to develop a specific and detailed proposal indicating the nature, scope, and cost of the study and to submit it to him. In view of the substantial progress which P.D.R.I. has made in developing a psychological screening technique which is unique among correctional systems, it is the hope of the Special Master that the Department will agree to cooperate in the follow-up project by applying the battery to applicants for correctional officer positions at correctional institutions other than M.C.I., by permitting analysis of subsequent on-the-job performance, and by providing necessary financial support for the project. In view of the financial support which the Law Enforcement Assistance Agency has provided for P.D.R.I.'s development of the battery, it is to be hoped that further financial support from that source can be obtained by the Department. In recommending that the Department authorize the follow-up study described above, the Special Master wishes to make it clear that he does not regard such a step as being essential to compliance with Paragraph 10(d) of the Court's Order. Therefore, whatever the Department's decision on this matter, it will not have the effect of delaying termination of this litigation.

The development of an orientation program for present and incoming staff as well as a program for in-service staff training will await the outcome of P.D.R.I.'s efforts. A new training officer, Mr. William Kempton, has been appointed recently at M.C.I., and the Special Master intends to ask Mr. Kempton to develop independent plans for such orientation and in-service training.

Finally, the Special Master has observed the new inmate orientation program which is held each week to convey to new inmates the institution's commitment to the principle of nondiscrimination. Such an inmate orientation program can be improved, in the opinion of the Special Master, by developing a format—probably relying heavily upon visual aids—to convey in a consistent manner the institution's commitment in this regard. For that purpose, the Special Master has employed the services of Mr. Thomas Durnford, the Director of Publications and

Graphics at The University of Toledo, to assist in the development of a "packaged" program for presentation to inmates. Mr. Durnford will visit M.C.I., attend an inmate orientation session, and commence work on the project in late January, 1977.

## CONCLUSIONS

Compliance plans have been developed or are in the process of development with respect to all portions of Paragraph 10 of the Court's Order. As plans have been completed, the institution has adopted them and thus has come into compliance with relevant subparagraphs of the Order. The very important task assumed by Personnel Decisions Research Institute is on schedule and promises highly satisfactory results. If the Department agrees to cooperate in conducting a follow-up longitudinal empirical validity study, evidence of the effectiveness of the psychological screening battery being employed at M.C.I. will be established beyond doubt. Such a development has extremely important and desirable ramifications not only for Ohio's correctional system but for other systems as well which are wrestling with the problem recognized and attempted to be dealt with by Paragraph 10(d) of the Court's Order.

## PARAGRAPH 11

In his second report, the Special Master recommended that

> the Court find the institution to be in compliance with Paragraph 11 insofar as it relates to assignment of inmates to various housing units within the stockade when the racial balance in each dormitory and cellblock reflects the racial balance of the overall stockade population allowing for a deviation factor of ± 5%. *Taylor v. Perini*, 421 F.Supp. 740, 774 (N.D.Ohio 1976).

This recommendation was adopted by the Court with the following additional requirement:

> Compliance will be monitored on a monthly basis by averaging the weekly reports for each cellblock and dormitory. If the average for the month is within ± 5% deviation factor, the institution should

be considered in compliance. *Taylor v. Perini*, 421 F.Supp. 740, 742 (N.D.Ohio 1976).

On October 21, 1976, following the confirmation of the Special Master's second report, the Special Master and his assistant met with Superintendent Perini, members of his staff, and his counsel to discuss the development of a compliance plan with respect to Paragraph 11. In the course of that meeting, it was agreed that M.C.I. would assign more whites to dormitories in which whites are underrepresented. It was acknowledged that this would pose special problems in several violence prone dormitories, e. g., 2 dormitory and 4 dormitory. It was agreed that requests from inmates seeking admission to the quiet dormitory (6–F) would be kept on file for six months in order to identify black inmates seeking admission to that unit when openings occurred.

That meeting produced agreement as well to assign more black inmates to cellblocks, with particular emphasis upon 6 cellblock to which it was agreed that no white inmate would be assigned without written notice to the Special Master. Finally, it was agreed that dormitories 2–B, 5, and 5–E would be excepted from the compliance standard on the basis that assignment to these dormitories is based upon participation in the institution's college and drug rehabilitation programs.

In addition to these matters relating to racial balance within various living units, Mr. Perini and his staff agreed to continue to make bed assignments in each dormitory in such a way as to produce a racially integrated bed pattern in each unit. It was agreed that integration of bed patterns in a few violence prone dormitories might have to be deferred until larger numbers of whites were assigned to those units.

The following data with respect to the main stockade is based upon reports submitted by the institution for the weeks of December 23, 1976, December 30, 1976, January 6, 1977 and January 13, 1977. Both whole numbers and percentages are an average of figures submitted for these weeks.

| Living Unit | # Black | # White | % Black | % White |
|---|---|---|---|---|
| 1 dormitory | 38.25 | 24.25 | 61.2 | 38.8 |
| 1A dormitory | 35.75 | 25.25 | 58.6 | 41.4 |
| 2 dormitory | 39.25 | 23.75 | 62.3 | 37.7 |
| 3 dormitory | 41.00 | 22.25 | 64.8 | 35.2 |
| 3C dormitory | 44.75 | 18.75 | 70.5 | 29.5 |
| 4 dormitory | 46.50 | 16.75 | 73.5 | 26.5 |
| 4D dormitory | 31.50 | 31.50 | 50.0 | 50.0 |
| 6 dormitory | 32.75 | 31.00 | 51.4 | 48.6 |
| 6F dormitory | 20.50 | 43.25 | 32.2 | 67.8 |
| 1 cellblock | 37.50 | 28.25 | 57.0 | 43.0 |
| 2 cellblock | 35.25 | 31.75 | 52.6 | 47.4 |
| 3 cellblock | 35.25 | 30.75 | 53.4 | 46.6 |
| 4 cellblock | 37.0 | 28.75 | 56.3 | 43.7 |
| 5 cellblock | 33.75 | 32.50 | 50.9 | 49.1 |
| 6 cellblock | 20.00 | 48.00 | 29.4 | 70.6 |
| Total (Cellblocks & Dormitories) | 529.00 | 436.75 | 54.8 | 45.2 |

These data establish that the following living units are in compliance with Paragraph 11 of the Court's Order: dormitories 1–A, 4–D, and 6, and cellblocks 1, 2, 3, 4, and 5. The following units are not in compliance: dormitories 1, 2, 3, 3–C, 4, and 6–F and cellblock 6. Thus more than half of the dormitories subject to the compliance standard and the "allotted" cellblock remain in a state of noncompliance. When these average figures are compared to those disclosed in the Special Master's second report, it can be seen that there has been improvement in dormitories 2, 3–C, and 4, as well as in cellblock 6 while racial imbalance has remained unchanged or increased slightly in dormitories 1, 3, and 6–F. *Taylor v. Perini*, 421 F.Supp. 740, 771 (N.D.Ohio 1976).

All inmates housed in dormitories 5 and 5–E are participating in Papillon, the institution's drug rehabilitation program. The racial breakdowns in these living units are 42% black—58% white and 46% black—54% white respectively. All evidence obtained by the Special Master indicates that assignment to the Papillon program, and thus to dormitories 5 and 5–E, is nondiscriminatory. While inmates continue to be admitted to the institution's educational program on a nondiscriminatory basis as well, only 31 of the inmates assigned to dormitory 2–B as of January 11, 1977, were participating in the college program. Five additional beds in this dormitory were occupied by a barber and porters assigned to work in that housing unit. Twenty-seven inmates with no relationship whatsoever to the college program or to dormitory maintenance were assigned to the dormitory as of that date.

Following the confirmation of the second report of the Special Master, the institution agreed to begin to assign new honor dormi-

tory inmates to beds in such a way as to reduce racial segregation in that unit. In addition, it was agreed that no inmate would be allowed to change his bed for a period of 90 days after his assignment thereto unless the transfer would improve racial balance in the dormitory. As of January 13, 1977, 217 inmates resided in the honor dormitory. Of these 134 (61.8%) were black and 83 (38.2%) were white. Population in each of the bays of this unit was the following as of that date:

| Bay | # Black | # White | % Black | % White |
|------|---------|---------|---------|---------|
| North | 55 | 54 | 50.5 | 49.5 |
| East | 79 | 29 | 73.1 | 26.9 |

On the date represented by these figures, approximately 20 beds were unoccupied as a result of the institution's policy to halt movement to the honor dormitory during the period of December and early January. Thus a relatively large number of beds are available at this time for assignment, and the racial pattern in both bays should improve when these assignments are made. Virtually no improvement has been made in the racial balance of either bay of the honor dormitory since the Special Master submitted his second report. *Taylor v. Perini*, 421 F.Supp. 740, 772 (N.D.Ohio 1976).

Procedures controlling assignment of beds in dormitories within the stockade continue to comply with the requirements of Paragraph 11 of the Court's Order. The result has been a fair mix of inmates of the two races in most of these units. Some attention is needed to the bed pattern in dormitory 2–B which is relatively segregated. In addition, bed patterns in several cellblocks remain virtually or largely segregated.

## CONCLUSIONS

Every effort must be made at M.C.I. to hasten desegregation of dormitories 1, 2, 3, 3–C, 4, and 6–F as well as cellblock 6, the allotted cellblock. Particular attention should be given to those units where little if any progress has been made over the past three months (dormitories 1, 3, and 6–F). In addition, the rationale for the exclusion of dormitory 2–B from the compliance standard has ceased to exist. Unless this dormitory is utilized virtually exclusively for inmates participating in the college program, the institution must meet the compliance standard of this paragraph with respect to that living unit. Efforts must commence in earnest to desegregate both bays of the honor dormitory and to produce a racially mixed bed pattern in those living areas. Finally, efforts should be made by the staff member charged with responsibility for bed assignments within the stockade to identify pockets of racial segregation in bed patterns in those units and to correct this situation as new bed assignments are made.

## PARAGRAPH 12

Full and final compliance was achieved by the institution with respect to this paragraph prior to the issuance of the Special Master's second report. *Taylor v. Perini*, 421 F.Supp. 740, 774 (N.D.Ohio 1976).

## PARAGRAPH 13

The institution remains in full compliance with the requirement that the Court's Order of September 12, 1972, be posted throughout the institution.

Appendices A–J to follow.

## APPENDIX A

THE ACADEMY FOR
CONTEMPORARY PROBLEMS

1501 NEIL AVENUE/COLUMBUS, OHIO 43201/(614) 421-7700

Washington Office
2030 M STREET N W/WASHINGTON D C 20036/(202) 467-6625

OPERATED BY:
Council of State Governments
International City Management Association
National Association of Counties
National Conference of State Legislatures
National Governors Conference
National League of Cities
U.S. Conference of Mayors

8 October 1976
Mr. George Denton
Director
Department of Rehabilitation and Correction
1944 Morse Road
Columbus, Ohio 43229

Dear Mr. Denton:

As result of an agreement reached between you and Professor Vincent M. Nathan, Special Master in the case of *Taylor v. Perini*, a special committee was formed on 1 July 1976, to study the inmate grievance mechanism now operating in the state and to recommend to you plans for an improved procedure. You selected four members of the committee. Professor Nathan chose one member in addition to serving himself. The committee consisted of the following members:

> *Mr. John Conrad*, Chairman. Mr. Conrad is Senior Fellow for the Center on Crime and Justice at the Academy for Contemporary Problems in Columbus, Ohio.

> *Dr. Henry Burns.* Dr. Burns is the Chairman of the Administration of Justice Department at the University of Missouri-St. Louis.

> *Mr. William Dallman.* Mr. Dallman is the Superintendent of the Lebanon Correctional Institution in Lebanon, Ohio.

> *Mr. Terry D. Taylor.* Mr. Taylor is the Deputy Superintendent for Treatment Services at London Correctional Institution in London, Ohio.

> *Mr. Thomas Adkins.* Mr. Adkins is the Assistant Personnel Administrator and the EEO Executive Officer for the Ohio Department of Rehabilitation and Correction.

> *Professor Vincent M. Nathan,* in his capacity as Special Master in *Taylor v. Perini*. Professor Nathan teaches at The University of Toledo College of Law.

Mr. Kenneth Cookson, a senior law student at The University of Toledo, provided staff support to the committee.

Through the summer, the committee met at The Academy for Contemporary Problems on a regular basis. A wide variety of published materials was presented to committee members for their study. We have attached a bibliography of references consulted. In addition,

Inmate Liaison Officers from the various institutions were invited to a meeting where their views on inmate grievance mechanisms were voiced. At another meeting, we interviewed the former Department Ombudsman, Mr. George Miller. To gain a perspective on procedures in other states, we met with Mr. Michael K. Lewis, a staff member of the Center for Community Justice in Washington, D. C. Mr. Lewis is a co-author of the LEAA Prescriptive Package entitled *Grievance Mechanisms in Correctional Institutions*. We consulted Mr. Maury C. Koblentz, the Department's grievance appeals officer to gain perspective on the present program. Members of our committee have interviewed the responsible staff of the Legal Services Program of the Department of Mental Health and Mental Retardation. Members of our committee have made several visits to institutions to gain direct improvisions of the problems facing the Department in improving grievance procedures.

Early this month we began to formulate a proposal for your consideration. We believe that as it stands it has many innovative aspects which constitute a significant departure from both the Department's present program and some of the recommendations of our consultants. We are confident that it is practicable and that it is potentially of great value to you and to succeeding Directors in assuring the administration of the Department that the conflicts of competing interests in the Department can be reconciled before they reach crisis levels. No grievance procedure will relieve all the complex problems confronting the Department or the institutions under its control, but we believe that the system proposed here will resolve legitimate inmate grievances fairly and expeditiously within the constraints of state law and the correctional setting.

Not incorporated in the procedures which are presented here is a recommendation concerning participation by line staff and inmates. The committee unanimously agrees that it is neither feasible nor desirable to provide for decision-making roles for either group in this system. However, we think that the Inspector of Institutional Services (the functionary who will replace the Inmate Liaison Officer) would be in a stronger position to identify developing problems if the Managing Officers would appoint staff and inmate committees on grievance procedures which could be periodically consulted by the Inspector. These committees should meet separately as a general rule, but it will be occasionally advantageous to conduct a joint meeting. What is at stake here is the creation of procedures which will increase the sensitivity of the grievance system—and of the institution as a whole, for that matter—to the concerns and avoidable discontents which generate conflicts between the officers and the inmates, two groups which are necessarily in continuous confrontation. If these two committees function well they can provide early warning of trouble so that steps can be taken to prevent it. They can also provide a sounding board for the Managing Officer and the Inspector of Institutional Services so that the consequences of conflict resolution can to some extent be assessed in advance of decisions made.

Finally, this letter would be incomplete without a personal expression of appreciation to you for the cooperation of your Department with the purposes of the committee. It has been an instructive pleasure to be associated with the members of your staff who have been appointed to serve with me. I have been impressed, and so have the other outside members of the committee, with the general quality of Departmental staff consulted by us. It has been an interesting assignment, and I can speak for all the committee in saying to you that we have enjoyed the opportunity and learned a great deal from it.

Cordially,
(s) John P. Conrad

John P. Conrad
Chairman
Committee on Inmate Grievance Procedures

JPC: sf

Enclosures
In triplicate

## ADMINISTRATIVE REGULATION

### THE OFFICE OF INSPECTOR OF INSTITUTIONAL SERVICES (845)

1. The Managing Officer of each institution shall appoint an appropriately qualified person to serve as a member of his staff who will be known as the Inspector of Institutional Services. The Inspector will investigate and process grievances of inmates and will take appropriate actions within the scope of his authority or make recommendations to the Managing Officer to effect their resolution. The Inspector shall also monitor the application of institutional and departmental regulations affecting the services and security of the institution. He will be given sufficient authority, civilian secretarial assistance, and resources to perform his duties in a confidential, impartial and effective manner.

2. The Inspector of Institutional Services reports directly to the Managing Officer and is also required to submit all reports, documents, or other forms of accountability of his work to the departmental Inspector General regularly, or as otherwise required.

3. The Inspector of Institutional Services shall be classified as an Administrative Assistant to the Managing Officer (Administrative Assistant II) and shall have the experience and special training needed to perform effectively the duties with which he is charged.

ADMINISTRATIVE REGULATION

THE OFFICE OF INSPECTOR GENERAL (845A)

1. The Inspector General shall be an individual appointed, pursuant to § 5120.07 of the Revised Code, by the Director of the Department of Rehabilitation and Correction to serve in the unclassified service as Division Chief of Special Services at the pleasure of the Director.

2. Pursuant to § 5120.06 of the Revised Code the Director shall establish the Division of Special Services and prescribe the powers and duties of said Division. The Inspector General (working title) shall serve as Division Chief, equivalent in status to all other Division Chiefs within the Department of Rehabilitation and Correction.

3. The individual selected as Inspector General shall be a person who has had experience and special training in the type of work with which the Division of Special Services is charged. The Inspector General shall be responsible and report directly to the Director of the Department of Rehabilitation and Correction.

4. The Inspector General shall

a) serve as chief administrator of the grievance procedure for inmates;

b) be responsible for recommending to the Director the resolution of inmate grievance appeals;

c) investigate and monitor practices within the Department of Rehabilitation and Correction to insure that all law as well as rules and regulations of the Department and subordinate facilities are being followed and applied fairly throughout the system and report to the Director any noncompliance with recommendations for corrective action;

d) maintain for a period of three years complete files on each grievance appealed to his office;

e) require monthly activity reports from each institution including all information relating to the grievance process;

f) submit to the Director an annual report on or before September 1 of each year (covering the preceding period of July 1 through June 30) including a statistical and narrative summary as to the number and nature of all grievances processed during the reporting period, their disposition, and the status of all pending grievances, by institution, throughout the Department of Rehabilitation and Correction. The annual report shall be made a part of the public record and shall be available to the public during reasonable hours. Copies of the annual report shall be distributed to the Governor, the Chief Justice of the Supreme Court of Ohio, and the Chairmen of the Senate and House Judiciary Committees;

g) continuously monitor the utilization and operation of the grievance procedure established by Administrative Regulations 845 and 845B;

h) conduct meetings, at least quarterly, with all Inspectors of Institutional Services;

i) initiate and supervise continuous training for departmental staff to maintain an active awareness and understanding of the grievance procedure for inmates;

j) conduct periodic audits of all records and files of each institution to insure proper documentation and utilization of the grievance procedure for inmates;

k) perform other duties related to grievance procedures as appropriate and/or assigned by the Director.

5. The Inspector General shall have all necessary authority to perform the required duties and responsibilities of the Division of Special Services. The Inspector General shall have full investigative powers and complete access at any time to all facilities, offices, or installations under the jurisdiction of the Department of Rehabilitation and Correction. All records, files, documentation, and any other information shall be available to the Inspector General upon request. Any employee or inmate of the Department of Rehabilitation and Correction who is found to have knowingly, deliberately or maliciously obstructed the investigation of the Inspector General by falsifying information in any manner will be subject to disciplinary action upon the recommendation of the Inspector General.

6. The Inspector General, with the support of sufficient staff, shall administer the departmental grievance procedure for inmates. He shall have a minimum of three centrally located staff members assigned as follows:

a) *Two assistant Inspectors General.* These individuals will assist the Inspector General in deciding grievance appeals, will provide continuous monitoring and auditing of the grievance procedure for inmates, and will be responsible for the compilation and publication of all data.

b) *Secretary.* This individual will provide clerical support for the office of the Inspector General.

7. The office of Inspector General shall not accept jurisdiction of a grievance until all administrative remedies have been exhausted at the local institution, with the exception of grievances to which the Managing Officer has been made a party. Such grievances naming the Managing Officer must show that the Managing Officer was personally involved in a violation of law or policy and approved it or did nothing to prevent it. Such grievances directed against a Managing Officer shall be referred immediately to the attention of the Inspector General for investigation and disposition.

Upon receipt of a grievance against a Managing Officer, the Inspector General shall send notice to all affected parties setting forth the date the grievance was received by the Inspector General and specifying that the grievance will be investigated and reviewed within twenty (20) working days. All affected parties shall be provided with a copy of the Inspector General's decision.

8. The Inspector General may establish procedures for the resolution of emergency grievances on a priority basis. An emergency grievance is one which requires immediate resolution in order to avoid irreparable harm to the inmate or to the institution.

## ADMINISTRATIVE REGULATION

### INMATE GRIEVANCE PROCEDURES (845B)

1. The grievance procedure outlined herein is designed to give inmates in Ohio correctional institutions a method for presenting complaints and problems relating to the conditions of their incarceration. It is intended to be the mechanism to which inmates may turn after they have attempted to resolve the problem or complaint with the staff member(s) most directly responsible for the aspect of institutional life in question.

2. Except as otherwise indicated in paragraph 3 below, a grievance may relate to any aspect of institutional life. It may concern departmental or local institutional policies, procedures, rules and regulations or the application of any of these to the grievant. It may also relate to actions on the part of any staff member affecting the grievant. A grievance must be specific in its description of the complaint or problem. A grievance filed with the Inspector of Institutional Services must be individual in nature even though other inmates may be similarly affected.

3. The grievance procedure is not designed to act as an additional or substitute appeal process in connection with Rules Infraction Board or institutional Hearing Officer proceedings. A complaint relating to a specific disciplinary decision will not be considered. In addition, complaints unrelated to institutional life such as legislative action, policies and decisions of the Adult Parole Authority, judicial proceedings and sentencing are not grievances within the scope of this Administrative Regulation.

4. The Managing Officer of each institution shall install locked mail boxes for inmates to mail kites and written requests. Each inmate shall receive either a written or an oral response as soon as possible but in no event more than five (5) working days after receipt by the appropriate staff member or administrator. Normal and routine requests and inquiries shall be handled informally.

5. An inmate should first attempt to resolve his grievance by contacting in person or in writing the appropriate institutional department or staff member whose area of responsibility is related to the grievance. If the inmate upon contacting the appropriate department or staff person does not have his grievance resolved to his satisfaction after a period of five (5) working days, the inmate in writing or in person shall notify the Inspector of Institutional Services of his grievance.

6. Upon notification by an inmate of a grievance, the Inspector of Institutional Services shall initiate appropriate actions to bring

about resolution of the grievance. If the grievance is of a nature that it can be resolved informally, the Inspector shall take such actions as are necessary to resolve the grievance and make a brief written description of the grievance and the method of resolution thereof in a log for that purpose. The log will be maintained for inspection by the Managing Officer and the Inspector General. If the grievance cannot be resolved informally, the inmate shall be required to outline his grievance in detail on a form for that purpose. If requested to do so, the Inspector of Institutional Services will provide assistance in the completion of this form. A copy of the completed form is to be retained by the inmate. Another copy will be retained by the Inspector of Institutional Services who will then conduct any necessary interviews, records research, or other forms of investigation to effect a proper determination of the grievance. He shall maintain a written record, on a form for that purpose, of all his activities and investigations as well as his conclusions and recommendations or actions concerning the grievance. Should this not be accomplished within a period of ten (10) working days, the Inspector of Institutional Services will notify the inmate in writing of the reasons for the extension of time with a copy to the Inspector General.

Extension of time beyond thirty (30) days must be approved by the Inspector General. If it is beyond the scope of his authority to effect a resolution of the grievance, the Inspector of Institutional Services shall submit his findings and recommendations concerning the disposition of the grievance to the Managing Officer for his endorsement, modification, or disapproval. Within ten (10) working days, the Managing Officer will respond to the Inspector who will then provide the inmate with a written statement of the determination of his grievance. Should the inmate be dissatisfied with the resolution of his grievance, he may appeal to the Inspector General. A form for this purpose and assistance in filing it will be provided by the Inspector of Institutional Services. The inmate shall make this appeal within five (5) working days of receipt of the determination of his grievance. All grievance files shall be maintained in the office of the Inspector of Institutional Services for a period of three years.

7. The Inspector of Institutional Services will be required to submit monthly reports summarizing his activities to the Managing Officer and the Inspector General. The form and content of the reports shall be prescribed by the Inspector General.

8. The Inspector of Institutional Services shall have authority to interview any institutional personnel or inmates necessary to investigate grievances and to determine compliance with departmental and institutional regulations. The Inspector of Institutional Services shall also have access to all relevant records and files.

9. The Inspector of Institutional Services will make a continuing survey of all institutional areas to determine compliance with ad-

ministrative and institutional regulations. The Inspector of Institutional Services will submit a report of his findings to the Managing Officer on a monthly basis or more often if necessary.

10. False accusations and statements by inmates or staff may be the subject of disciplinary action only when made in a knowing, deliberate, and malicious attempt to cause significant injury to another party and the potential for such injury is substantiated. The burden of proof in such cases shall always rest with the accuser. Failure of an inmate to substantiate his grievance accusations shall not, by itself, be used as grounds to initiate disciplinary action.

## ADMINISTRATIVE REGULATION

### EXTERNAL REVIEW OF INMATE GRIEVANCE PROCEDURES (845C)

1. The Department shall authorize the creation of a Grievance Procedure Review Commission to provide continuing external review of the inmate grievance procedures at both the institutional and departmental levels. The Commission consists of nine members selected as follows:

> five by the deans of the state supported law schools in Ohio;

> three, at least two of whom are not employees of the Department of Rehabilitation and Correction, by the Director of the Department; and

> one, who serves as Chairman, by the Chief Justice of the Supreme Court of Ohio.

Formal appointment will be made by the Director pursuant to § 5120.31 of the Ohio Revised Code. Members shall serve without compensation but are entitled to reimbursement for expenses incurred in the performance of their duties in accordance with state reimbursement policies. Members shall serve for a period of two years and are eligible for reappointment to successive terms.

2. It is the duty of the Commission to examine and review the operation and effectiveness of the inmate grievance system which has been adopted in Administrative Regulations 845, 845A, and 845B. On or about September 1 of each year, the Commission will submit a written report to the Director containing its findings as well as any recommendations for change. The report will deal with the grievance system as it operates in Ohio's correctional institutions as well as in the office of the Inspector General.

3. For the purpose of conducting its examination and preparing its report, the Commission shall have access to all correctional institutions under the jurisdiction of the Department as well as to all relevant records maintained in those institutions and in the office of the Inspector General. All employees of the Department are required to respond promptly to all reasonable requests for assistance by the Commission.

4. Within thirty (30) days of receipt of the Commission's report, the Director will respond in writing. It is then the duty of the Chairman of the Commission to release the Commission's report together with the Director's response to the Governor, the Chairmen of the Senate and House Judiciary Committees, the Chief Justice of the Supreme Court of Ohio and to the public. This release is required whether or not the Director has responded to the report. All documents released by the Commission must be maintained in the office of the Inspector General as well as in the offices of Inspectors of Institutional Services throughout the state.

Bibliography of Materials Used by Special Committee

*Statutory and Quasi-statutory Material*
Department of Rehabilitation and Correction, *Administrative Regulations* 845, 847.

Ohio Revised Code § 5120 (P. 1974).

*Other Material*

Fourth United Nations Congress on Prevention of Crime and Treatment of Offenders, *Standard Minimum Rules for Treatment of Offenders* (1955).

M. Keating, et al., *Grievance Mechanisms in Correctional Institutions* (1975).

M. Keating, *Improved Grievance Procedures: A Technical Assistance Manual* (1976).

M. Keating, et al., *Seen But Not Heard: A Survey of Grievance Mechanisms in Juvenile Correctional Institutions* (undated).

Krantz, Bell, Brant & Magruder, *Model Rules and Regulations on Prisoners' Rights and Responsibilities* (1973).

Minnesota Ombudsman for Corrections, *Annual Report* (1973-74, 1974-75).

National Advisory Commission on Criminal Standards and Goals, *Standards* (1973).

National Council on Crime and Delinquency, *Model Act for the Protection of Rights of Prisoners* (1975).

National Sheriffs' Association, *Standards for Inmates' Rights* (1974).

Ohio Advisory Committee to the U. S. Civil Rights Commission, *Protecting Inmate Rights: Prison Reform or Prison Replacement?* (1976).

Ohio Citizens' Task Force on Corrections, *Final Report* (1976).

Ohio Department of Rehabilitation and Correction, *First* and *Second Annual Reports of the Ombudsman* (1973, 1974).

South Carolina Department of Corrections, *Inmate Grievance Procedures* (1973).

.APPENDIX B

## DEPARTMENT OF REHABILITATION AND CORRECTION

5120–9–29. *The Office of Inspector of Institutional Services.*

(A) The Managing Officer of each institution shall appoint an appropriately qualified person to serve as a member of his staff who will be known as the Inspector of Institutional Services. The Inspector will investigate and process grievances of inmates and will take appropriate actions within the scope of his authority or make recommendations to the Managing Officer to effect their resolution. The Inspector shall also monitor the application of institutional and departmental regulations affecting the services and security of the institution. He will be given sufficient authority, civilian secretarial assistance, and resources to perform his duties in a confidential, impartial and effective manner.

(B) The Inspector of Institutional Services reports directly to the Managing Officer and is also required to submit all reports, documents, or other forms of accountability of his work to the departmental Chief Inspector monthly, or as otherwise required.

(C) The Inspector of Institutional Services shall be an Administrative Assistant to the Managing Officer and shall have the experience and special training needed to perform effectively the duties with which he is charged.

| | |
|---|---|
| Effective Date | December 31, 1976 |
| Former Rule Number | 845 |
| Promulgated Under | 111.15 |
| Statutory Authority | 5120.01 |
| Expires | Indefinite |

## DEPARTMENT OF REHABILITATION AND CORRECTION

5120–9–30. *The Office of the Chief Inspector.*

(A) The Chief Inspector shall be an individual appointed, pursuant to 5120.07 of the Revised Code, by the Director of the Department of Rehabilitation and Correction to serve in the unclassified service as Division Chief of Special Services at the pleasure of the Director.

(B) Pursuant to § 5120.06 of the Revised Code, the Director shall establish the Division of Special Services and prescribe the powers and duties of said Division. The Chief Inspector (working title) shall serve as Division Chief, equivalent in status to all other Division Chiefs within the Department of Rehabilitation and Correction.

(C) The individual selected as Chief Inspector shall be a person who has had experience and special training in the type of work with which the Division of Special Services is charged. The Chief Inspector shall be responsible and report directly to the Director of the Department of Rehabilitation and Correction.

(D) The Chief Inspector shall

(1) serve as chief administrator of the grievance procedure for inmates.

(2) be responsible for recommending to the Director the resolution of inmate grievance appeals.

(3) investigate and monitor practices within the Department of Rehabilitation and Correction to insure that all law as well as rules and regulations of the Department and subordinate facilities are being followed and applied fairly throughout the system and report to the Director any noncompliance with recommendations for corrective action.

(4) maintain for a period of three years complete files on each grievance appealed to his office.

(5) require monthly activity reports from each institution including all information relating to the grievance procedure.

(6) submit to the Director an annual report on or before September 1 of each year (covering the preceding period of July 1 through June 30) including a statistical and narrative summary as to the number and nature of all grievances processed during the reporting period, their disposition, and the status of all pending grievances, by institution, throughout the Department of Rehabilitation and Correction. The annual report shall be made a part of the public record and shall be available to the public during reasonable hours. Copies of the annual report shall be distributed to the Governor, the Chief Justice of the Supreme Court of Ohio, and the Chairman of the Senate and House Judiciary Committees.

(7) continuously monitor the utilization and operation of the grievance procedure established by Administrative Regulations 5120–9–29 and 5120–9–31.

(8) conduct meetings, at least quarterly, with all Inspectors of Institutional Services.

(9) initiate and supervise continuous training for departmental staff to maintain an active awareness and understanding of the grievance procedure for inmates.

(10) conduct periodic audits of all records and files of each institution to insure proper documentation and utilization of the grievance procedure for inmates.

(11) perform other duties related to grievance procedures as appropriate and/or assigned by the Director.

(E) The Chief Inspector shall have all necessary authority to perform the required duties and responsibilities of the Division of Special Services. The Chief Inspector shall have full investigative powers and complete access at any time to all facilities, offices, or installations under the jurisdiction of the Department of Rehabilitation and Correction. All records, files, documentation, and any other information shall be available to the Chief Inspector upon request. Any employee or inmate of the Department of Rehabilitation and Correction who is found to have knowingly, deliberately or maliciously obstructed the investigation of the Chief Inspector by falsifying information in any manner will be subject to disciplinary action upon the recommendation of the Chief Inspector.

(F) The Chief Inspector, with the support of sufficient staff, shall administer the departmental grievance procedure for inmates. He shall have a centrally located staff, as necessary, with the following duties.

(1) Assistant Chief Inspectors. These individuals will assist the Chief Inspector in deciding grievance appeals, will provide continuous monitoring and auditing of the grievance procedure for inmates, and will be responsible for the compilation and publication of all data.

(2) Secretary. This individual will provide clerical support for the office of the Chief Inspector.

(G) The office of Chief Inspector shall not accept jurisdiction of a grievance until all administrative remedies have been exhausted at the local institution, with the exception of grievances to which the Managing Officer has been made a party. Such grievances naming the Managing Officer must show that the Managing Officer was personally involved in a violation of law or policy and approved it or did nothing to prevent it. Such grievances directed against a Managing Officer shall be referred immediately to the attention of the Chief Inspector for investigation and disposition.

(H) Upon receipt of a grievance against a Managing Officer, the Chief Inspector shall send notice to all affected parties setting forth the date the grievance was received by the Chief Inspector and specifying that the grievance will be investigated and reviewed within twenty (20) working days. All affected parties shall be provided with a copy of the Chief Inspector's decision.

(I) The Chief Inspector may establish procedures for the resolution of emergency grievances on a priority basis. An emergency grievance is one which requires immediate resolution in order to avoid irreparable harm to the inmate or to the institution.

| | |
|---|---|
| Effective Date | December 31, 1976 |
| Former Rule Number | 845(a) |
| Promulgated Under | 111.15 |
| Statutory Authority | 5120. |
| Expires | Indefinite |

## DEPARTMENT OF REHABILITATION AND CORRECTION

5120-9-31. *Inmate Grievance Procedures.*

(A) The grievance procedure outlined herein is designed to give inmates in Ohio correctional institutions a method for presenting complaints and problems relating to the conditions of their incarceration. It is intended to be the mechanism to which inmates may turn after they have attempted to resolve the problem or complaint with the staff member(s) most directly responsible for the aspect of institutional life in question.

(B) Except as otherwise indicated in Paragraph C below a grievance may relate to any aspect of institutional life. It may concern departmental or local institutional policies, procedures, rules and regulations or the application of any of these to the grievant. It may also relate to actions on the part of any staff member or inmate affecting the grievant. A grievance must be specific in its description of the complaint or problem. A grievance filed with the Inspector of Institutional Services must be individual in nature even though other inmates may be similarly affected.

(C) The grievance procedure is not designed to act as an additional or substitute appeal process in connection with Rules Infraction Board or institutional Hearing Officer proceedings. A complaint relating to a specific disciplinary decision will not be considered. In addition, complaints unrelated to institutional life such as legislative action, policies and decisions of the Adult Parole Authority, judicial proceedings and sentencing are not grievances within the scope of this Administrative Regulation. No claim involving subject matter exclusively within the jurisdiction of the courts or other agencies will be considered. For example, a claim seeking monetary compensation for personal injury or property loss, which is exclusively within the jurisdiction of the Ohio Court of Claims, will not be considered. Such claims which present allegations which in part fall within the purview of Paragraph B (Above) and in part within this paragraph will be considered in so far as they are not excluded under this paragraph.

(D) The Managing Officer of each institution shall install locked mail boxes for inmates to mail kites and written requests. Each inmate shall receive either a written or an oral response as soon as possible but in no event more than five (5) working days after receipt by the appropriate staff member or administrator. Normal and routine requests and inquiries shall be handled informally.

(E) An inmate should first attempt to resolve his grievance by contacting in person or in writing the appropriate institutional department or staff member whose area of responsibility is related to the grievance. If the inmate upon contacting the appropriate department or staff person does not have grievance resolved to his satisfaction after a period of five (5) working days, the inmate in writing or in person shall notify the Inspector of Institutional Services of his grievance.

(F) Upon notification by an inmate of a grievance, the Inspector of Institutional Services shall initiate appropriate actions to bring about resolution of the grievance. If the grievance is of a nature that it can be resolved informally, the Inspector shall take such actions as are necessary to resolve the grievance and make a brief written description of the grievance and the method of resolution thereof in a log for that purpose. The log will be maintained for inspection by the Managing Officer and the Chief Inspector. If the grievance cannot be resolved informally, the inmate shall be required to outline the grievance in detail on a form for that purpose. If requested to do so, the Inspector of Institutional Services will provide assistance in the completion of this form. A copy of the completed form is to be retained by the inmate. Another copy will be retained by the Inspector of Institutional Services who will then conduct any necessary interviews, records research, or other forms of investigation to effect a proper determination of the grievance. He shall maintain a written record, on a form for that purpose, of all his activities and investigations as well as his conclusions and recommendations or actions concerning the grievance. Should this not be accomplished within a period of ten (10) working days, the Inspector of Institutional Services will notify the inmate in writing of the reasons for the extension of time with a copy to the Chief Inspector. Extension of time beyond thirty (30) days must be approved by the Chief Inspector. If it is beyond the scope of his authority to effect a resolution of the grievance, the Inspector of Institutional Services shall submit his findings and recommendations concerning the disposition of the grievance to the Managing Officer for his endorsement, modification, or disapproval. Within ten (10) working days, the Managing Officer will respond to the Inspector who will then provide the inmate with a written statement of the determination of his grievance. Should the inmate be dissatisfied with the resolution of his grievance, he may appeal to the Chief Inspector. A form for this purpose and

assistance in filing it will be provided by the Inspector of Institutional Services. The inmate shall make this appeal within five (5) working days of receipt of the determination of his grievance. All grievance files shall be maintained in the office of the Inspector of Institutional Services for a period of three years.

(G) The Inspector of Institutional Services will be required to submit monthly reports summarizing his activities to the Managing Officer and the Chief Inspector. The form and content of the reports shall be prescribed by the Chief Inspector.

(H) The Inspector of Institutional Services shall have authority to interview any institutional personnel or inmates necessary to investigate grievances and to determine compliance with departmental and institutional regulations. The Inspector of Institutional Services shall also have access to all relevant records and files.

(I) The Inspector of Institutional Services will make a continuing survey of all institutional areas to determine compliance with administrative and institutional regulations. The Inspector of Institutional Services will submit a report of his findings to the Managing Officer on a monthly basis or more often if necessary.

(J) False accusations and statements by inmates or staff may be the subject of disciplinary action when made in a knowing, deliberate, and malicious attempt to cause significant injury to another party and the potential for such injury is substantiated. The burden of proof in such cases shall always rest with the accuser. Failure of an inmate to substantiate his grievance accusations shall not, by itself, be used as grounds to initiate disciplinary action.

| | |
|---|---|
| Effective Date | December 31, 1976 |
| Former Rule Number | 845(b) |
| Promulgated Under | 111.15 |
| Statutory Authority | 5120.01 |
| Expires | Indefinite |

APPENDIX C

TO: MEMBERS OF THE SPECIAL COMMITTEE TO MONITOR THE INMATE GRIEVANCE SYSTEM

FROM: GEORGE F. DENTON, DIRECTOR, DEPARTMENT OF REHABILITATION AND CORRECTION VINCENT M. NATHAN, SPECIAL MASTER, *TAYLOR v. PERINI*

SUBJECT: JOINT CHARGE TO THE SPECIAL COMMITTEE TO MONITOR THE INMATE GRIEVANCE SYSTEM

DATE: JANUARY 7, 1977

On December 1, 1975, a Special Master was appointed by the United States District Court in *Taylor v. Perini*, litigation relating to the Marion Correctional Institution. One of the findings contained in the *First Report of the Special Master on the Defendant's State of Compliance*, 413 F.Supp. at 198 (N.D.Ohio 1976), was that "(t)here is no effective grievance procedure maintained to process complaints relating to racial discrimination, harassment, intimidation or insult." This finding was adopted by the court in March, 1976.

As a result, the Department of Rehabilitation and Correction and the Special Master agreed to the appointment of a special committee to study the then existing inmate grievance system and to propose a more independent and effective system. That committee, under the chairmanship of Mr. John Conrad, worked through the summer of 1976. In addition to Mr. Conrad, the committee consisted of three employees of the Department of Rehabilitation and Correction, Dr. Henry Burns, a nationally recognized expert on corrections and criminal justice, and the Special Master. The committee interviewed local institutional grievance officers in seven of Ohio's eight adult correctional facilities, the person who occupied the position of Departmental Ombudsman when that office existed in Ohio, outside consultants and others. In September, 1976, the committee reported to the Director.

The newly adopted grievance system, reflected in Administrative Regulations 5120–9–29, 30, 31, which are attached to this charge, reflects the recommendations of the special committee with minor exceptions. On only one point were the Director and the committee unable to agree, and that was upon whether to implement a permanent external review commission to monitor and report upon the system. As the result of negotiations between the Director and the Special Master, your committee was established to study and evaluate the new system and to report to both the Director and the Special Master at the end of six months.

The newly adopted system provides for the appointment of an Inspector of Institutional Services in each local institution. The responsibilities and authority of this local grievance officer are stated in Administrative Regulation 5120–9–31. In addition, Administrative Regulation 5120–9–30 provides for the appointment of a Chief In-

spector with the rank of Division Chief at the Departmental level. This officer serves both as a grievance appeals officer and as the Department's monitoring agent for the entire system. Although the finding of the Special Master which provided the impetus for the development of the new system related specifically to complaints concerning racial discrimination, harassment, and insult, the new Administrative Regulations are designed to deal with the entire range of redressable grievances and are not limited to the resolution of issues relating to race.

It is the function of your committee to study and evaluate the revised inmate grievance system throughout the state with special emphasis upon the Marion Correctional Institution. In particular, you are to ascertain whether the grievance system is effective, independent, and feasible; and, if not, to recommend such modifications as would accomplish those objectives. To be effective the system should provide fair resolution of complaints by inmates against staff and by inmates against inmates. The term independent refers to a clear line of authority within the Department under which the grievance officers are responsible. In order to be feasible, the system should operate in a manner consonant with state law and workable in the corrections setting, taking into account legitimate security requirements.

In order to accomplish this task, you will have complete access to all of Ohio's adult correctional institutions, departmental and institutional records relating to grievances, and all employees of the Department of Rehabilitation and Correction. Your function is not to resolve grievances and you should not attempt to act as a substitute for or an addition to the grievance and disciplinary procedures now in effect.

You may request compilation of data, interview staff and inmates on a confidential basis, study records maintained both in local institutions and the Department and take such other steps as are necessary— all with a view toward providing a factual basis for your report and any recommendations it may contain. What the sponsors of this committee want is your collective judgment, based upon careful investigation, concerning the efficacy of the new system at both the Departmental and the local institutional levels, together with any recommendations for change which you believe to be desirable. Your report should contain a detailed statement of your findings, conclusions, and recommendations.

Both the Director and the Special Master are prepared to assist this committee in any way possible. They are in agreement that the grievance system which the committee has been commissioned to study occupies a role of central importance in the affairs of the Department. Because an effective grievance system will not only further the goal of fundamental fairness but also is valuable in maintaining institutional security, the Department intends to provide effective and legitimate avenues for redress of complaints against staff or other inmates. The system which was recently adopted represents the De-

partment's effort to provide such an effective, independent, and feasible mechanism, and the report of this committee will be of the utmost importance to all concerned with the continuing operation of the system.

George F. Denton, Director
Department of Rehabilitation & Correction

Vincent M. Nathan, Special Master
*Taylor v. Perini*

## APPENDIX D

## MARION CORRECTIONAL INSTITUTION RESIDENT COUNCIL GUIDELINES

I. NAME: Marion Correctional Institution Resident Council

Effective August 6th, 1976, a permanent council of residents will be established and known as the Resident Council. The following guidelines will be followed.

II. PURPOSE:

The MCI Resident Council will exist to serve in a liaison and representative capacity to promote a mutually meaningful form of communication and understanding between the residents and the administration of the Marion Correctional Institution. To offer advice and aid in resolving disputes and effect settlements between the administration and residents as swiftly and smoothly as possible.

III. PHILOSOPHY:

We believe that true communication between the inmate body and the administration can effectively eliminate the barriers that tend to hinder the road to progress, and that by establishing a vehicle through which we can relate all parties can accomplish much.

We believe that the consistent and demonstrable practice of Truth and the principle of Right will induce a more congenial atmosphere; an atmosphere in which many problems can be solved and differences reconciled. We are convinced that this concept will lead to a more humane environment in which to live and work. . . .

IV. RESIDENT COUNCIL:

 A. The Resident Council will be governed by this written format and procedures of operation. Amendment procedures are explained in section: *Amendments*.

 B. The Resident Council will have no authority explicit or implicit over the staff or the administration, and no member will assume authority for personal gain to himself, the Resident Council, or any member or group of members of the Resident Council.

C. The Resident Council's business will be regarding matters of general interest that are relevant to the entire population.

D. The Resident Council's business will be conducted with the Superintendent, his immediate associates, or his designated representative(s), and with any other member of the staff or administration.

E. The Resident Council will be willing to accept any administrative referrals for counseling either as a body or on a one to one basis.

F. The Resident Council will be willing to consider any recommendations and/or ideas presented by the administration.

V. STRUCTURE:

A. The Resident Council will consist of eighteen (18) block representatives and one (1) Spanish-American representative.

1. Each representative will have two (2) alternates.

2. The committees will be created and composed of representatives and alternates as needed.

B. The Resident Council will function in the following manner:

1. Resident issues will be presented to the Resident Council, via suggestion boxes, direct contact between block representatives and residents, and sub-committee reports.

2. The Resident Council will screen and forward all issues to respective committees.

3. The committees will investigate all issues and make recommendations to the Resident Council.

4. The Resident Council will meet once a week to deal with issues presented by committees and determine priorities.

5. The Executive Committee will present the issues of priority to the Superintendent and/or his representative(s).

VI. MEMBERSHIP:

A. Each member must uphold his office to the best of his ability, being cognizant that he is a "Representative" of the entire resident body.

B. To be eligible for election to the Resident Council a resident must have lived within the Stockade for a minimum of ninety (90) successive days prior to the election date.

VII. ELECTION:

A. Elections will be held each one-hundred and eighty (180) days. After the initial election.

B. Each block will elect one (1) representative and two (2) alternates.

C. A "one man one vote" system will prevail for elections.

D. Voting will be by secret ballot. Two ballots will be distributed to each resident in every lock; one ballot for the representative and one ballot for the alternates.

E. A roster will be posted in each lock ten (10) days prior to election. Anyone eligible who wants to be a candidate for office can indicate so by signing the roster. The roster will be posted for two (2) days.

F. Seven (7) days prior to elections, a sign will be posted in each lock listing the names of those eligible persons living in that lock who have indicated their desire to be candidates for office.

G. In the event that a Resident Council member is unable to complete his term of office, a special election will be held in the lock he represents assuming the normally scheduled elections are more than four (4) weeks in the future.

H. The Resident Council will establish an election committee as needed.

I. The election committee will determine the eligibility of each candidate, and conduct all elections.

J. The elections will be monitered by an MCI staff member and a designated council member.

K. All ties will be broken by a run-off election by option of candidates.

VIII. OFFICERS:

A. There will be four (4) officers in the Resident Council and four (4) officers for each committee; these being, Chairman, Secretary, Co-Chairman and Co-Secretary.

B. The Chairman will preside at all meetings and maintain order. He is to bring forth the necessary business of the Resident Council.

C. Secretary will keep the minutes of all the Resident Council meetings and records and handle all correspondence.

D. Election of the Chairman and Secretary will be done at one hundred and eighty (180) day intervals and will be determined by a majority vote of the Resident Council, this procedure will also apply for election of committee officers.

**618**

E. The Resident Council reserves the right to appoint an election Judge from the council to officiate when needed.

IX. MEETINGS:

A. The Resident Council will meet at least once each month with the Superintendent and/or his representative(s).

B. The Resident Council may request the presence of resident or institution staff member to its scheduled meetings.

C. Any Resident Council member shall be subject to removal from the Resident Council by a two-thirds (⅔) majority vote of the members of the Resident Council.

D. Any action passed by the Resident Council must be passed by a simple majority vote.

E. Special meetings of the Resident Council may be called by a majority vote at any regular meeting, or by the Chairman.

F. Fifteen (15) duly elected members of the Resident Council shall constitute a quorum.

G. Procedural process by which all Resident Council meetings shall be conducted:

1. The Chairman will call meetings to order.
2. The Secretary will call the roll.
3. The Chairman will proceed with the agenda.
4. The Chairman will adjourn all meetings.

X. SUPPLIES AND FACILITIES:

A. The Resident Council shall have facilities to carry on its business, e. g., a conveniently located meeting place, typewriter, related supplies, and others upon request.

B. Provisions will be made for the issuance of a special pass card to each member of the Resident Council and his Alternates for convenience in conducting business of the Resident Council.

XI. AMENDMENTS:

A. Any amendment to these guidelines will require two-thirds (⅔) majority vote of the Resident Council.

B. Proposed amendments may be brought to the floor for debate at any Resident Council meeting and a vote taken on the proposed amendment.

MARION CORRECTIONAL INSTITUTION
RESIDENT COUNCIL
INTERNAL ETHICS

CONDUCT:

A...The conduct of all committee men shall conform with those of the institution.

B...All commitee men shall conduct themselves in a respectful manner and in a manner complimentary to the philosophy and spirit of the Resident Council.

C...All committee men shall be an individual but must keep the thought of the group in mind.

D...Any committee man having a complaint or suggestion shall submit such complaint or suggestion to the chairman in charge of that particular area.

E...Only the chairman of the respective committees shall express or represent the feelings and philosophies of the Resident Council in regards to grievances or suggestions.

F...No committee man shall represent the feelings or philosophy of the Resident Council to the institutional staff or administration relative to grievances or suggestions, without the proper mandate.

## DUTY:

A...All committee men shall attend all meetings except for valid reason (sickness, priority pass, work assignment commitment, etc.)

B...Any member not able to attend a meeting must inform his chairman or some member of the group of his reason for being absent prior to the meeting.

C...Any member who misses a meeting without a valid excuse shall be reprimanded.

## PROTOCOL:

A...All members shall be punctual in attending all meetings.

B...Repeated tardiness will be dealt with.

C...All committee men and advisor(s) wishing to obtain the floor must raise his hand and be recognized by the chairman.

D...Any member recognized by the chairman shall stand when given the floor.

E...No member or advisor(s) shall address the floor or stand without first being recognized by the chairman.

## CHAIRMAN:

It is the duty of the chairman or presiding officer to enforce the rules and orders of the assembly, without debate or delay. It is also the right of every member, who notices a breach of a rule, to insist upon its enforcement. In such a case he shall rise from his seat, and say, "Mr. Chairman, I rise to a point of order." The speaker should immediately take his seat, and the chairman requests the member to state his point of order, which he does, and resumes his seat. The chair decides the point, and then, if no appeal is taken, permits the first member to resume his speech. If the member's remarks are decided to be improper, and anyone objects to him continuing his speech, he cannot continue it without a vote of the assembly to that effect.

Any member wishing to either give additional information to a speaker or seek additional information from a speaker may do so by raising his hand and saying, "Mr. Chairman I have a point of information." This motion cannot interrupt a speaker without his consent but may interrupt the proceedings. A point of information cannot be debated, nor does it require a second.

All Internal Ethics shall be adhered to by all members of the Resident Council and advisor(s) as proposed and accepted by the Resident Council members.

It is suggested by the internal ethics committee that a Judiciary committee be formed to deal with any and all infractions thereof.

## MARION CORRECTIONAL INSTITUTION
## HONOR DORMITORY AFFAIRS COUNCIL
## CONSTITUTION AND BY-LAWS

Effective August 9, 1976 a committee of elected inmates was established and will be known as the Honor Dormitory Affairs Council. The following Constitution and By-Laws will be followed.

## PURPOSE

### ARTICLE I

The Honor Dormitory Affairs Council is formed to serve in a liaison capacity between the Honor Dormitory population and the administration of the Marion Correctional Institution Honor Dormitory in an effort to bring improvements in areas of inspection and communication.

## HONOR DORMITORY AFFAIRS COUNCIL

### ARTICLE II

1. The Honor Dormitory Affairs Council will be governed by this written Constitution and By-Laws.

2. The Honor Dormitory Affairs Council will function only in a liaison and advisory capacity and will have no authority to establish, control, dictate or otherwise administer institution policy.

3. The Honor Dormitory Affairs Council will have no authority explicit or implied over other inmates, staff, or the administration and no member will assume authority for personal gain to himself or any other member or group of members of the Honor Dormitory Affairs Council.

4. The Honor Dormitory Affairs Council's business will be in regards to matters of general interest only and will not be concerned with the grievance or grievances of an individual inmate.

5. The Honor Dormitory Affairs Council's business will be conducted with only the Superintendent, his immediate associates or his designated representative and whatever staff or department head is concerned.

## MEMBERSHIP QUALIFICATIONS

### ARTICLE III

1. The following qualifications will govern eligibility for membership on the Honor Dormitory Affairs Council.

(a) Each member must agree to uphold his office to the best of his ability being cognizant that he is a representative of the entire inmate body.

(b) To be eligible for election to the Honor Dormitory Affairs Council, an inmate must have lived within the Honor Dormitory a minimum of ninety (90) days uninterrupted by parole or escape, i. e., a candidate must have lived within the Honor Dormitory those ninety (90) days prior to the election date and shall not have less than six (6) months to the review or parole board.

(c) An Honor Dormitory Affairs Council member cannot serve more than six (6) months at the end of which time he can run for re-election for a period of six (6) months, for a total of twelve (12) months. After having served his full term of twelve (12) months, he will not be eligible for re-election until expiration of the succeeding term of six (6) months.

## ELECTION OF MEMBERS

### ARTICLE IV

1. Elections will be held each one-hundred and eighty (180) days.

2. Each dormitory wing will have three (3) representatives and three (3) alternates.

3. The three (3) inmates receiving the highest number of votes in each dormitory wing, will become the elected representatives.

The three (3) inmates receiving the next three (3) highest number of votes in each dormitory wing, will become the elected alternates.

4. A term of office will be one-hundred and eighty (180) days.

5. Ten (10) days prior to the election, a roster will be posted in each dormitory. Anyone eligible who wants to be a candidate for office can indicate so by signing the roster; the roster will be posted for two (2) days.

6. Seven (7) days before the election, a sign will be posted in each dormitory, indicating the names of those persons living in that dormitory who have indicated their desire to be a candidate.

7. Ballots will be printed with the names of each candidate for a given dormitory.

8. A "one man—one vote" system will prevail for elections.

9. Voting will be by secret ballot, one ballot will be distributed to each member of each dormitory; a ballot box will be located in an appropriate place or picked up.

10. Voting is voluntary, but all inmates are encouraged to vote.

11. In the event that an Honor Dormitory Affairs Council member is unable to complete his term, a special election will be held for an alternate to replace him by vote of the Honor Dormitory Affairs Council, a subsequent election will be held in the housing dormitory in which an alternate is needed. If the scheduled elections date is less than four (4) weeks, the position will remain vacant.

12. A person elected to serve only a partial term may succeed himself, if so elected at the expiration of the partial term.

## DUTIES OF MEMBERS

### ARTICLE V

1. The Honor Dormitory Affairs Council will consist of twelve (12) members.

2. There will be three (3) officers in the Honor Dormitory Affairs Council, these being the Chairman, Secretary, and Assistant Secretary.

3. The Chairman will preside at all meetings and will maintain order, he is to bring forth the necessary business of the Honor Dormitory Affairs Council.

4. The Secretary will keep all minutes of the meetings and records as well as handle all correspondence. The Secretary will preside over all meetings in the absence of the Chairman, and the Assistant Secretary will then assume the duties of the Secretary.

5. The Assistant Secretary will assume all duties of the Secretary in the absence of the Secretary.

6. Reappointment of the Chairman, Secretary and Assistant Secretary will be done at sixty (60) day intervals and will be determined by a two-thirds (⅔) majority vote of the Honor Dormitory Affairs Council.

7. The representatives will meet with the Superintendent once a month, and with the Liaison Officer for the Honor Dormitory Affairs Council twice a month.

8. The representatives shall bring all dormitory views on all subjects to the meeting whether they be pro or con.

9. The representatives should get to know their dormitory personally.

10. Representatives and alternates will meet once a week.

11. Representatives are to report back on all administration changes and policy changes unbiasedly.

12. The representatives and alternates will appoint an election judge to officiate elections when necessary.

13. Alternates will assume the duties of the representatives in the absence of the representative.

## MEETINGS

### ARTICLE VI

1. The Honor Dormitory Affairs Council shall meet once a week.

2. The Honor Dormitory Affairs Council shall meet with the Honor Dormitory Affairs Council Liaison Officer twice each month.

3. The Honor Dormitory Affairs Council shall meet once a month with the Superintendent or his representatives.

4. The Honor Dormitory Affairs Council may request the presence of any inmate or member of the institution staff at its scheduled meeting with the Superintendent.

5. Special meetings of the Honor Dormitory Affairs Council may be called by a majority vote at any regular meeting or by the Chairman.

6. Nine (9) duly elected members of the Honor Dormitory Affairs Council shall constitute a quorum.

7. Call to Order: Chairman, Roll Call: Secretary, Minutes of Previous Meeting: Secretary, Old Business: Representatives and Alternates Report, New Business: Representatives and Alternates Report, Adjournment: Chairman.

### BY-LAWS

1. All meetings with the administration shall be posted in each dormitory.

2. Copies of all meetings with the administration shall be given to all members of the Honor Dormitory Affairs Council, and a copy shall be read to the inmate body at count time.

3. The Honor Dormitory Affairs Council shall work on one (1) major problem at a time.

4. Any Honor Dormitory Affairs Council member shall be subject to removal from the Council by a two-thirds (⅔) majority vote of the members for conduct reasons.

5. Unexcusable absences twice in a row or twice in one (1) month will terminate membership in the Honor Dormitory Affairs Council automatically.

6. Continued major R.I.B. infractions and correctional cell time shall be cause for termination of membership from the Honor Dormitory Affairs Council.

7. Any action passed by the Honor Dormitory Affairs Council must be passed by a two-thirds (⅔) majority vote.

APPENDIX D—Continued °

8. Special meetings of the Honor Dormitory Affairs Council may be called by a majority vote at any regular meeting or by the Chairman.

9. Nine (9) duly elected members of the Honor Dormitory Affairs Council shall constitute a quorum.

10. The Honor Dormitory Affairs Council shall present a prepared agenda of topics for discussion to the Honor Dormitory Affairs Liaison Officer, to present to the Superintendent at least seven (7) days prior to any scheduled meeting.

11. All prepared agendas of topics for discussion and reports are to be signed by all six (6) Honor Dormitory Affairs Council representatives before they are sent to the Superintendent.

## SUPPLIES AND FACILITIES

The Honor Dormitory Affairs Council will have facilities to carry on its work, such as conveniently located meeting place, a typewriter, related supplies and necessary stationery.

## AMENDMENTS

1. Any amendments to the Constitution and By-Laws of the Honor Dormitory Affairs Council will require two-thirds (⅔) majority vote of the Honor Dormitory Affairs Council.

2. Proposed changes may be brought to the floor for debate at any Honor Dormitory Affairs Council meeting and a vote may be taken on the proposed change or changes.

## APPENDIX E

### INMATE COUNCIL REPORT

#### AUGUST 1976—JANUARY 1977

This is the first report of the M.C.I. Inmate Council, the purpose of which is to inform the inmate population of the business conducted by Council during the term August, 1976—January, 1977. In the future, Council will submit a mid-term report in addition to its term report.

After certification of the elections of August 6, 1976, approximately six weeks were devoted to organizing the Council, drafting a constitution, by-laws, election of officers, establishing committees. The time consumed for organizational purposes may appear to have been unnecessarily long, but a sound and well based structure is imperative if such a body is to function effectively and efficiently. We feel this time was well spent.

On balance, this Council has been, to some degree, successful in resolving some of the problems affecting the population at this institution. Firstly, priorities had to be established relative to the order in which Council would address itself to problems confronting the population. In this regard, the linen shortage (sheets & pillow-

cases), the sound system (movies), and delivery and handling of Xmas packages were matters Council first addressed itself to. A fair assessment of our efforts here would be that the linen and audio system problems are in the process of resolvement resulting from meetings with management, staff, and Council. The Xmas packages were handled and delivered with a minimum of complaints. Of course, the manner of priorities may be subject to question, but, generally, Council felt they were all of sufficient consequence to the inmate population to warrant its attention first.

Before management at the present time are three matters for its consideration: food service on the diet line; microwave oven for the visiting room; and cameras being permitted in the visiting room. Dr. Keeler has assumed full responsibility for resolving the diet line problem and we anticipate a solution in the very near future. There has been no action on the microwave oven and cameras as of this time.

Areas presently being pursued, but not yet presented to management are as follows: cafeteria (food service & sanitation); commissary and I & E fund; radio, T.V. repair; play area for children outside the visiting room; and irregularities in mail handling and delivery. These matters should, in all probability, be presented to management for its consideration during the month of January, 1977.

A minus for this Council has been the lack of or the reluctance of the population to submit complaints and proposals through the suggestion box located in the hall beside the mail box. This is one of the means through which the population can express its wishes as to what it wants of Council. The purpose of Council is to reflect the wants and needs of the population to management, and, in concert with management, attempt to satisfy these wants and needs. To do this effectively, we must have input from the population. We urge you to make use of the suggestion box. Also, the attendance of some lock representatives at Council meetings has left a good deal to be desired.

Council works with the Special Master in connection with the Taylor v. Perini Order and is specifically assisting the Master with the revision of the Inmate Manual and job description and qualification guidelines. Also, we have been consulted by the Special Master relative to the revision of the grievance procedure which will take effect in the not too distant future. This should all be of some benefit to the population.

It is fair to say that we have had a favorable reception from management with respect to matters thus far presented to it.

Several problems in locks, shops, and departments have been resolved with the assistance of custody and treatment. These are situations characterized as "in house" and usually do not require the attention of management. Cooperation from custody and treatment in these situations has been noteworthy.

Council is committed to work toward and for the general welfare of the inmate population and to that end your cooperation and assistance are encouraged and appreciated.

Respectfully submitted,

/s/ Alvin White, Chairman
Inmate Council

APPENDIX F

STATE OF OHIO

# DEPARTMENT OF REHABILITATION & CORRECTION

## MARION CORRECTIONAL INSTITUTION

BOX 57

MARION, OHIO 43302

JAMES A. RHODES - GOVERNOR

GEORGE F. DENTON - DIRECTOR

E PETER PERINI - SUPERINTENDENT

December 17, 1976

TO: Those Concerned

FROM: Michael D. Marsino, Honor Dorm Liaison Officer

SUBJECT: Honor Dorm Affairs Council Agenda

The following is an up-date of the results of the monthly meetings of Superintendent Perini and the Honor Dorm Affairs Council for the months of October and November 1976. The council has brought these matters to the attention of the superintendent and the following agreements have been reached.

### AGENDA #1—CAFETERIA

1. A full time, qualified food service supervisor has been assigned to the honor dorm dining room and will have this as his first responsibility.

2. White clothing has been issued to cafeteria personnel and will be required for those persons who work in the preparation and serving areas. Hats will be required for personnel working directly with food.

3. Cleanliness and sanitation standards will be maintained at a level appropriate to the dining room.

 A. Every effort will be made to keep the dining room at full inmate-employee capacity.

 B. Parolees may be periodically assigned for dining room cleaning details at the superintendent's discretion.

 C. Periodic inspections will be held by Capt. Williams and M. D. Marsino.

4. The 9:00 P.M. meal will be reevaluated regarding those authorized to eat at this time. Reports will be made.

5. The deep fryer and exhaust system will be checked, evaluated, and repaired as parts and materials are available. This has already been done for the dish machine.

6. The problem of the continuing shortage of cups and silverware requires the cooperation of both the administration and the council. The administration has recently placed a large order for these items and upon receipt, a proportionate amount will go to the honor dorm with intentions that close supervision be exercised over it. The council has agreed to encourage the inmate body to make proper use of these items.

7. It was originally agreed that a system would be devised where men assigned to the dining room could be released to use the restroom facilities when necessary. As the result of an evaluation done by the maintenance department, it appears that it is feasible to install restrooms in the dining room; this will be further investigated.

8. Copies of the advance "Master Menu" will be made available to the Honor Dorm Food Service Department.

9. Council has pointed out that on occasion, the main-dish meal has run out, thereby creating a shortage of food or the need for a substitute. The administration has agreed to evaluate the reasons why this happens and to correct the situation so that, barring an emergency or very unusual circumstance, these occurrences will be minimal.

AGENDA #2—VISITING

1. It is agreed that with the increased number of men at the honor dorm, investigation will be made as to enlarging the visiting room itself. The maintenance department will be asked to evaluate this situation. An answer as to what can be done, and when, will be made by January 31, 1977.

2. It is agreed that the restroom facilities for visitors need to be expanded. The maintenance department evaluated this situation on December 7, 1976 and we are attempting to devise a plan which will result in the facilities being roughly doubled. As

costs are established and priorities assigned, a final time for beginning this work will be made known within the next 30 days.

3. The beginning, in mid January 1977, of the use of the Honor Dorm Security Station for the processing of visitors should result in resolving the matters of public "patting down" of women visitors. Also a new system for the use of inmate package carrier will be incorporated in the procedures.

4. At the council's request, the present "Off Limits" signs on areas in the yard will be reevaluated. If the yard area can be enlarged and desired security factors maintained, this will be done. Final answer will be given by March 1, 1977.

5. Plans have been obtained and cost factors gathered for more benches or tables in the yard visiting area—final answer by March 1, 1977.

6. Agreement has been made to reevaluate the procedure for dairy barn and hog lot men to be given time to prepare for their visits. The solution to this probably depends on how the Saturday/Sunday work schedule is arranged. The council has agreed to poll inmates in these areas and report their findings to the superintendent. Final answer when council makes its written report.

7. Any special matters regarding out-of-state visits will still have to be cleared through the superintendent's office, in writing, in advance.

8. The council mentioned the overall treatment of visitors on the part of the security staff. The superintendent indicated that there is a necessity for normal continuing screening and surveillance. Should there be a specific incident resulting in a discourtesy to a visitor, it should be dealt with by appropriate reports to supervisory personnel or the use of the inmate grievance procedure.

9. Allow inmates to bring small amounts of food back from their visits. Mr. Perini states that this cannot be done because rules from the Department of Correction state no, but he will allow this to be done during the holidays from December 11, 1976 to January 3, 1977.

10. Extend visiting hours, No, will leave as is (8:30 A.M. to 3:00 P.M.) and the visiting room clock will be set accordingly.

11. Should be able to wear blues or khakis on visiting days. No, Department of Correction rules state that all honor dorm facilities must wear green.

12. The question of allowing one-time visits for persons not on the visiting list was rejected at this time. It is felt that adequate procedure exists for the placement of approvable visitors on the individual's list.

13. Arrange a small play area for children. This request was not granted at this time.

(s) R. Fair
R. Fair, Rep.

(s) B. Dotson
B. Dotson, Rep.

(s) H. Jackson
H. Jackson, Rep.

(s) L. Gonzales
L. Gonzales, Assist. Sec.

(s) M. C. Nappier
M. Nappier, Secretary

(s) Michael D. Marsino
Michael D. Marsino,
Honor Dorm Liaison Officer

APPROVED:

(s) E. P. Perini
E. P. Perini, Superintendent

(s) Rudy Hudson
R. Hudson—Honor Dorm Affairs
Council, Chairman

## APPENDIX G

### BOOKS FOR THE MAIN LIBRARY

*1. Cohen, Morris. *Legal Research in a Nutshell.* 2d ed. St. Paul: West Publishing Co., 5 copies.

2. Cohen, Morris, ed. *How to Find the Law.* 7th ed. St. Paul: West Publishing Co.

*3. Black's Law Dictionary.

*4. Israel, Jerold H. & Wayne LaFave. *Criminal Procedure in a Nutshell.* St. Paul: West Publishing Co., 5 copies.

5. Loewy, Arnold. *Criminal Law.* St. Paul: West Publishing Co. (Nutshell series) 5 copies.

6. Clark, Homer. *Domestic Relations.* St. Paul: West Publishing Co. (Hornbook series).

7. Meier, Carl. Anderson's *Ohio Family Law.* Cincinnati: Anderson.

8. *Ohio Jurisprudence.* 2d series. Rochester: Lawyer's Co-op. Approx. 70 vols. plus subscription to pocket parts.

9. Handman, Herbert I. *The Rights of Convicts.* Dobbs Ferry, N. Y. Oceana Publishing Co., 1975. (Legal Almanac Series No. 73).

10. Hermann, Michele. *Prisoners' Rights Sourcebook*. N. Y., Clark Boardman, 1973.

11. Rudovsky, David. *The Rights of Prisoners: The Basic ACLU Guide to a Prisoner's Rights*. N. Y., Discus, 1973.

12. *Ohio Criminal Law Handbook*. Cincinnati: Anderson, 1976.

13. Anderson, Ronald A. *Wharton's Criminal Law and Procedure*. Rochester, N. Y. Lawyer's Co-op. 5 vols. plus subscription to pocket parts.

## APPENDIX H

### BOOKS FOR THE HONOR DORM LAW LIBRARY

FEDERAL MATERIALS

*1 *United States Code Annotated*
Library should have Constitution, Titles 18, 28, 42. Some of the volumes are there, but lacking are the following items:

> Constitution Amendments 1 to 4
> 2 paper supplements: Amendments 6 to 12 and 14 to end
> Title 18: Rules 1 to 9
> Title 18: Rules 10 to 17.1
> Title 18: Rules 18 to 31
> Title 28: Rules 1 to 11
> Title 28: Rules 12 to 16

Need subscription to current pocket parts and paper bound quarterly supplements.

*2 *Supreme Court Reporter*. St. Paul: West Publishing Co. BEGIN WITH V. 93.

*3 *Federal Reporter*. St. Paul: West Publishing Co. BEGIN WITH V. 354.

*4 *Federal Supplement*. St. Paul: West Publishing Co. BEGIN WITH V. 365.

*5 Shepard's *United States Citations*. Colorado Springs: Shepard's Citations.

5a *Modern Federal Practice Digest*. St. Paul: West Publishing Co. Regular and 2d series.

*6 Shepard's *Federal Citations*.

7 Current pocket parts for Wright, Charles. *Federal Practice & Procedure*.

*8 Sokol, Ronald P. *Federal Habeas Corpus*. 2d ed. Charlottesville, Michie, 1969.

STATE MATERIALS

*1 *Page's Ohio Revised Code Annotated*. Cincinnati: W. H. Anderson. Complete set with current materials volume.

*2 *North Eastern Reporter* (2d series) (Ohio cases) St. Paul: West Publishing Co.

*3 Shepard's *Ohio Citations*.

*4 Schroeder-Katz *Ohio Criminal Law Practice & Forms.* Cleveland: Banks-Baldwin.

*5 Anderson's *Ohio Criminal Practice & Procedure.* 2 vols.

*6 West's *Ohio Digest.* 2d series. (Approx. 70 vols.) St. Paul: West Publishing Co.

7 *Ohio Criminal Law Handbook.* Cincinnati: Anderson, 1976.

## GENERAL MATERIALS

*1 Black's Law Dictionary.

*2 *Criminal Law Reporter.* Washington, D. C. Bureau of National Affairs.

*3 Israel, Jerold & Wayne R. LaFave. *Criminal Procedure in a Nutshell.* St. Paul: West Publishing Co. 2 copies.

4 Loewy, Arnold. *Criminal Law.* St. Paul: West Publishing Co. (Nutshell series) 2 copies.

5 LaFave, Wayne and Austin Scott, Jr. *Hornbook on Criminal Law.* St. Paul: West Publishing Co.

*6 Cohen, Morris. *Legal Research in a Nutshell.* St. Paul: West Publishing Co. 2 copies.

7 Cohen, Morris, ed. *How to Find the Law.* 7 ed. St. Paul: West Publishing Co.

*8 Bailey, F. Lee and Henry Rothblatt. *Complete Manual of Criminal Forms, Federal and State.* Rochester: Lawyer's Co-op.

9 Meier, C. Anderson's *Ohio Family Law,* Cincinnati, W. H. Anderson.

10 Handman, Herbert I. *The Rights of Convicts.* Dobbs Ferry, N. Y. Oceana Publications, 1975. (Legal Almanac Series No. 73.)

*11 Palmer, John. *Constitutional Rights of Prisoners.* Cincinnati: Anderson.

12 Hermann, Michele. *Prisoners' Rights Sourcebook.* N. Y., Clark Boardman, 1973.

13 Anderson, Ronald A.'s *Wharton's Criminal Law and Procedure.* Rochester, N. Y. Lawyer's Co-op. 5 vols. plus subscription to pocket parts.

14 Rudovsky, David. *The Rights of Prisoners: The Basic ACLU Guide to a Prisoner's Rights.* N. Y., Discus, 1973.

## APPENDIX I

### DEPARTMENT OF
### REHABILITATION AND CORRECTION
### INTRA–DEPARTMENTAL REFERENCE

December 15, 1975

TO: E. B. Haskins, Deputy Director; K. E. Tope, Chief, Division of Administrative & Fiscal Operations; M. E.

Wheeler, Chief, Division of Institutional Services; All Managing Officers.

FROM: Stephen T. Yost, Administrative Assistant—Legal

SUBJECT: Inmate Law Libraries

It is my recommendation that the following materials be provided in each institution law library for the use of inmates. Law libraries need not provide materials in addition to those listed. In some instances duplicate sets of case materials are currently being provided. This is unnecessary. By cancelling duplicate subscriptions, monies can be made available to purchase those listed materials not presently provided. Unless otherwise indicated, one set or copy of any item is sufficient. As you may note, such items as *West's Ohio Digest* are not recommended.

Please have your institution librarian determine the level of compliance with this list.

### FEDERAL MATERIALS

1. United States Code Annotated. St. Paul: West. 27 vols. and several pamphlets: *Constitution*; *Titles* 18; 28 (Sec. 2241–2255, Federal Rules of Appellate Procedure, Rules of Supreme Court, Federal Rules of Evidence); 42 (Sec. 1981–1985). Approx. $195. ($60. annual upkeep.)

2. Supreme Court Reporter. St. Paul: West. Vol. 80—(1960—to date). 15 vols. Approx. $250. ($45. annual upkeep.)

3. Federal Reporter (2nd series). St. Paul: West. Vol. 273—(1960 to date). 185 vols. Approx. $1700. ($200. annual upkeep.)

4. *Federal Supplement.* St. Paul: West. Vol. 180—(1960 to date). Approx. 170 vols. Approx. $1200. ($200 annual upkeep.)

5. Shepard's United States Citations. Colorado Springs: Shepard, 1968. 5 vols. Approx. $175. ($64. annual upkeep.)

6. Shepard's Federal Citations. Colorado Springs: Shepard. Federal Supplement; Federal Reporter, 2d Series. 201–390 vol. (6th ed.) 1969 series. Approx. $175. ($64. annual upkeep.)

7. Rules of local federal district courts. Free from court clerks.

### STATE MATERIALS

1. North Eastern Reporter (2nd series) (Ohio cases). St. Paul: West. Vol. 159, 160—(1960 to date).

2. *Page's Ohio Revised Code Annotated.* Cincinnati: W. H. Anderson, Appendix, Civil Rules, Titles 1, 19, 21, 23, 25–27, 29 (1954 Ed. with 1973 Supplement for use in 1974), 29 (1975 Ed.) 51–53, 37.11 vols.

3. *Shepard's Ohio Citations* Cases and Statutes. Colorado Springs: Shepard. Approx. $105. ($52. annual upkeep.)

4. Schroeder—Katz Ohio Criminal Law Practice and Forms. Cleveland: Banks-Baldwin. 2 vols. Approx. $75. ($20. annual upkeep.)

5. *Criminal Law Reporter.* Washington, D. C.: Bureau of National Affairs. Weekly. Vols. 15 to date. Approx. $250. ($150. annual upkeep.)

## GENERAL MATERIALS

1. *Complete Manual of Criminal Forms*, Federal and State, Bailey, F. Lee and Rothblatt, Henry B., Rochester: Lawyers Cooperative, 1968. Approx. $35. ($10. annual upkeep).

2. *Black's Law Dictionary;* Black, Henry C. (latest ed.) St. Paul; West. Approx. $20.

3. *Legal Research in a Nutshell* (latest ed.) ; Cohen, Morris L., St. Paul: West. Approx. $5.

4. *Criminal Procedure in a Nutshell,* Israel, Jerold H. and La-Fave, Wayne R. St. Paul: West. Approx. $5.

5. *Federal Habeas Corpus* (latest ed.). Sokol, Ronald P. Charlottesville, Va.: Michie. Approx. $30.

6. *Constitutional Rights of Prisoners;* Palmer, John W. (current supplement) ; Cincinnati: Anderson; Approx. $10 ($5. annual upkeep).

7. *Ohio Post Conviction Manual* available from the Department Central Office at no charge.

## APPENDIX J

### DEPARTMENT OF REHABILITATION AND CORRECTION

5120–9–19. *Printed Materials.*

(A) Definitions as used in this Administrative Regulation.

(1) "Contemporary community standards" means the standards prevalent in the social environment of an urban center, such as Columbus, Cincinnati or Cleveland, with their range of literature and magazines which are available to the general adult public.

(2) "Taken as a whole" means viewed in its entirety. It does not refer to an isolated depiction or description.

(3) "Serious literary artistic, political, or scientific value" means a substantial value which is not merely a contrivance designed to protect otherwise obscene material.

(4) "Prurient interest" means an interest in that which is lewd or lustful.

(5) "Patently offensive" means a depiction or description, which is graphic or explicit rather than merely suggestive.

(6) "Nudity" means the graphic or explicit portrayal of the naked penis or vagina.

(B) An inmate may receive a reasonable number of printed materials directly from a publisher or distributor. Such materials may be received from other sources such as the inmate's family or friends with prior approval of the managing officer or his designee. All materials are subject to security inspection and review pursuant to this regulation.

(1) Printed materials falling within the scope of this provision include the following: newspapers; magazines; pamphlets; books; photographs, whether or not of persons known or related to the inmate; drawings; and pre-recorded magnetic tapes. Printed material does not include personal letters.

(2) Printed material, to be excludable, must be obscene or must constitute a clear and present danger to the security or safety of an institution.

(C) Each institution may establish and post regulations limiting the maximum amount of printed material which may be retained by an inmate. Such regulations shall be forwarded to the Director for review and approval.

(D) Printed material may be excluded from an institution for one or both of the following reasons:

(1) The printed material is obscene under United States Supreme Court standards. In order to be considered obscene and thus subject to exclusion, printed material must meet all the following three standards, which should be considered in the order stated below.

(a) The printed material depicts or describes, in a patently offensive way, conduct falling within one or more of the following categories.

(i) Nudity emphasizing a state of sexual arousal or stimulation; for example, a male erection or graphic exposure of the clitoris.

(ii) Nudity emphasizing masturbatory activity.

(iii) Portrayal of explicit sexual acts, heterosexual or homosexual, including vaginal, anal, oral, and manual acts.

(iv) Portrayal of acts of bestiality; that is, sexual relations between human being and an animal.

(v) Portrayal of acts of sado-masochism emphasizing the infliction of pain.

(vi) Portrayal of an excretory function.

(b) The average person, applying contemporary community standards, would find that the printed material, taken as a whole, appeals to the prurient interest.

(c) The printed material, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(2) The printed material is inflammatory; that is, the presence of the printed material in the institution would constitute a clear and present danger to the security or safety of the institution. No publication shall be considered inflammatory solely on the basis of its appeal to a particular ethnic, racial, or religious audience. In order to constitute a clear and present danger to the security or safety of the institution, the printed material must meet at least one of the following criteria.

 (a) Printed material which incites, aids, or abets criminal activity, such as rioting or illegal drug use.

 (b) Printed material which incites, aids, or abets physical violence against others, including instruction in making, using, or converting weapons.

 (c) Printed material which incites, aids, or abets escape, such as instruction in picking locks or digging tunnels.

(E) The Director shall appoint an advisory Publication Screening Committee composed of five members. At least one member of the committee shall be an attorney, at least one shall be experienced in the area of literature, at least one shall be a full-time departmental employee, and at least one shall not be a departmental employee.

(F) All incoming printed material shall be screened by the institution mail office. All printed material which is found to be neither obscene nor inflammatory shall be promptly forwarded to the addressee. All printed material which the mail office reasonably believes to be either obscene or inflammatory shall be withheld from the inmate. The mail office shall promptly notify the inmate of the identification of the printed material, the reason for its being withheld, and the inmate's right to a review by the managing officer or his designee.

(1) When the inmate requests review of the mail office's decision to withhold the printed material, the printed material shall be forwarded to the managing officer or his designee, which may be a panel of three or more members, only one of whom may be from the custody staff.

 (a) As soon as practical after receipt of the printed material, the managing officer or his designee shall decide whether the printed material is acceptable. A hearing at which the inmate is present may be conducted to aid the managing officer or his designee in making that decision.

 (b) A decision to exclude the printed material shall be in writing, setting forth that the material is either obscene or inflammatory, or both, and the reason(s) therefore. A copy of such written decision shall be forwarded promptly to the inmate together with notice of the inmate's right to request within seven days review by the Publication Screening Committee. The

managing officer or his designee shall maintain a written record of such decisions for at least one year.

(c) If the decision of the managing officer or his designee is that the printed material should not be excluded, the printed material shall be forwarded promptly to the inmate.

(2) Failure of the inmate to request review of the mail office's decision to withhold the printed material, within seven days of notice thereof, shall constitute acceptance of that decision and the printed material shall be disposed in accordance with paragraph (H) below.

(3) Failure of the inmate to request review of the decision of the managing officer or his designee by the Publication Screening Committee within seven days after notice thereof shall constitute acceptance of that decision and the printed material shall be disposed in accordance with paragraph (H) below.

(G) When the inmate timely requests review by the Publication Screening Committee, the managing officer or his designee shall forward the printed material together with the written decision concerning it to the Publication Screening Committee.

(1) The Publication Screening Committee shall immediately notify the Department and all institutions of the challenge of any printed material and all deliveries of the challenged printed material shall be stayed.

(2) The Publication Screening Committee shall, within 28 business days, recommend to the Director whether the printed material is obscene or inflammatory. The committee shall use as its criteria the standards set forth above and shall consider both the institution's reasons for excluding the printed material and objections of the inmate, if any are received.

(3) If the Director determines that the printed material is neither obscene nor inflammatory, it shall be forwarded to the inmate addressee and all managing officers of the institutions shall be informed of the decision.

(4) If the Director determines that the printed material is either obscene or inflammatory or both, the managing officer of the challenging institution and the inmate to whom it was addressed shall be informed in writing that the printed material is being excluded from the institution and the reasons therefore. At that time, all other managing officers shall be notified of the decision.

(H) Printed material which is excluded pursuant to this administrative regulation may be disposed at the discretion of the managing officer in any of the following manners:

(1) At the request of the inmate destroyed or forwarded to an approved visitor at the inmate's expense.

(2) Returned to the United States Postal Services.

(3) Held as evidence.

(I) The Director or his designee shall compile and periodically update a list of printed materials which have been reviewed by the Publication Screening Committee and found to be unacceptable. The list shall be forwarded to all institutions, and shall be available in the mail office, Inspector of Institutional Services office, legal services office, library, and other locations designated by the managing officer. No listed printed material may be admitted to the institution. The mail office shall notify the inmate that the material has been excluded by order of the Director, and the material shall then be disposed in accordance with Paragraph (H) above.

Effective Date December 31, 1976
Former Rule Number 814(b)
Promulgated Under 111.15
Statutory Authority 5120.01
Expires Indefinite